536 F.2d 494
 GREATER NEW YORK HOSPITAL ASSOCIATION and Peninsula Hospital
Center, on behalf of themselves and all other voluntary
nonprofit hospitals which are members of Greater New York
Hospital Association and which are reimbursed for Medicare
services rendered to hospital patients under the Periodic
Interim Payments Plan established in 1968, Plaintiffs-Appellants,
United Hospital et al., Intervenor Plaintiffs-Appellants,
v.
F. David MATHEWS as Secretary of the United States
Department of Health, Education and Welfare, and
James B. Cardwell, as United States
Commissioner of Social
Security,
Defendants-
Appellees.
 Nos. 747, 811, Dockets 75-6128, 76-6007.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 23, 1976.
Decided May 14, 1976.
 
 Jacob Imberman, New York City (Susan C. Rosenfeld, Toby R. Hyman, Jeffrey S. Gunin, Proskauer, Rose, Goetz & Mendelsohn, New York City, of counsel), for appellants.
 Andrew Ross, New York City (Hayt, Hayt, Tolmach & Landau, Great Neck, N. Y., of counsel), for intervenor appellants.
 Frederick P. Schaffer, Asst. U. S. Atty., New York City (Thomas J. Cahill, U. S. Atty., S. D. N. Y., New York City, Taggart D. Adams, Steven J. Glassman, Asst. U. S. Attys., New York City, on the brief), for appellees.
 Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This appeal concerns a change in the HEW regulations affecting the method by which hospitals are reimbursed for the furnishing of services to Medicare beneficiaries. Appellants sued for declaratory and injunctive relief seeking to review the administrative regulation 20 C.F.R. § 405.454 (j),[1] issued under 42 U.S.C. § 1395g[2] by the Secretary of Health, Education and Welfare (HEW), promulgated after preliminary notice in 39 Fed.Reg. 2011 on July 16, 1975, 40 Fed.Reg. 29815. The United States District Court for the Southern District of New York, Charles M. Metzner, Judge, dismissed the complaint on the ground that the challenged regulation was not subject to judicial review.[3] We affirm the judgment.
 
 
 2
 When Medicare first became operational in 1966, the interim payment system adopted was simply the conventional method by which health care facilities had always been reimbursed by health insurance programs. The hospitals, or "providers," submitted a billing form on which the services and charges to the patient were itemized, to a Medicare intermediary, such as Blue Cross/Blue Shield of New York,[4] which processed the bills and sent back payments to the hospitals. But in 1968, because of delays in processing, a method of interim reimbursement was made available to hospitals for in-patient services only. This permitted payments to be disbursed prior to the receipt of billing forms. Based upon estimated cost projections level amounts of payment were disbursed at set intervals, subject to adjustment at the end of a given period of time, usually a fiscal year, thus increasing the predictability of cash flow to hospitals. This system was known as Periodic Interim Payments, or PIP, and it provided for payments on a weekly or biweekly regular basis, although most hospitals elected to take weekly payments. Of about 6,700 hospitals participating in the Medicare program, between January, 1968, and January, 1973, only about 800 elected to use the method, the others remaining on the conventional system of reimbursement.
 
 
 3
 The new PIP system in the regulation under challenge evidently was proposed after a determination that the old PIP method was resulting in overly generous treatment of the hospitals or at least an unnecessarily "liberal" use of the Federal Hospital Insurance Trust Fund, 42 U.S.C. § 1395i, resulting in the loss of interest on the trust fund. Under the old PIP system there was only an average three-and-a-half day lag between the delivery of services to patients and disbursement of payments. Under new PIP, the payments cover a two-week rather than a one-week period and are disbursed no earlier than two weeks after the end of the service period, see note 1 supra, resulting in an average 21-day lag between treatment and payment. The new PIP system was made available to hospitals in September, 1973, and in January, 1974, the challenged regulation was proposed to require hospitals on old PIP to convert to new PIP. The regulation was promulgated in July, 1975, with a final implementation date of May 31, 1976, and all hospitals under the old PIP system except appellants have since December, 1975, been required gradually to convert to new PIP.
 
 
 4
 In November, 1975, appellants Greater New York Hospital Association and Peninsula Hospital Center, on behalf of themselves and members of the Association on the old PIP system, together with 25 intervenor hospitals, sued to enjoin the new PIP regulation as arbitrary, capricious, and an abuse of discretion. At the consolidated hearing on the preliminary injunction and the trial on the merits, appellants presented evidence that the required conversion from old PIP to new PIP will result in a big cash flow problem for them, especially since they are located in a large urban center which necessitates a lot of work on a charity basis. Because some of the appellant hospitals already have large loans outstanding and lack additional collateral, they urge that they will be unable to borrow more money and will either have to delay payment of bills to their vendors and thereby have to pay higher prices for their goods or, if they are so fortunate as to be able to borrow to make up for the lost cash flow, will have to incur additional interest expenses. These effects seem to follow necessarily from the time lag under the new PIP system and they are the mirror reflection of the interest earnings that the Federal Hospital Insurance Trust Fund will be able to make by virtue of the time lag.[5]
 
 
 5
 We agree with the district court, however, that in stating that each "provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly)," the statute, 42 U.S.C. § 1395g, note 2 supra, commits the timing of Medicare payment dates to agency discretion by law within the meaning of 5 U.S.C. § 701(a)(2).[6] Therefore the new PIP regulation is not subject to judicial review under the Administrative Procedure Act (APA). We believe that this decision follows a correct application of the standards established by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). This is one of what must be a very limited number of cases where "statutes are drawn in such broad terms that in a given case there is no law to apply." S.Rep.No. 752, 79th Cong., 1st Sess. 26 (1945), quoted in Citizens to Preserve Overton Park, Inc. v. Volpe,supra, 401 U.S. at 410, 91 S.Ct. at 821, 28 L.Ed.2d at 150. Unlike the statute held reviewable in Overton Park, the Medicare Act sets forth no factors that the Secretary must consider or abide by in determining the timing of payments. The language "as the Secretary believes appropriate" is as open-ended as it could conceivably be, and is limited only by the condition in the parenthetical that payments be made not less often than monthly. Because no other standards are set forth according to which the Secretary must exercise his discretion, a court has quite literally no indicia by which it may evaluate that exercise and hence no power of review under § 701(a)(2).
 
 
 6
 The holding of the district court is further supported by East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524 (9th Cir. 1972), and our own Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969). In East Oakland-Fruitvale the decision of the Director of the Office of Economic Opportunity in determining whether a program vetoed by a state governor was "fully consistent with the provisions and in furtherance of the purposes" of the Economic Opportunity Act, 42 U.S.C. § 2834, was held nonreviewable. East Oakland-Fruitvale, supra, 471 F.2d at 528, 533. There in effect the Director simply had to determine in evaluating the program whether the particular project was wise or desirable as a means to further the act, a standard so general that a court could not practicably make any evaluation of the propriety of the determination.[7] In Kletschka v. Driver, decisions of the Veterans Administration concerning the awarding of research grants were held unreviewable as committed to agency discretion because of the unfeasibility of review by courts lacking a necessary considerable scientific and medical expertise. There is a point at which the nature of administrative decisions is such that they should be treated as committed to agency discretion because they are simply not subject to judicial evaluation. See K. Davis, Administrative Law Treatise § 28.08, at 947 (1970 Supp.); Saferstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367 (1968).
 
 
 7
 Kingsbrook Jewish Medical Center v. Richardson, 486 F.2d 663 (2d Cir. 1973), and Aquavella v. Richardson, 437 F.2d 397 (2d Cir. 1971), relied on by intervenor appellants, are inapposite, in that the former involved substantive determinations as to whether a specific reimbursement under the Medicare program was correct and the latter whether the Secretary could suspend Medicare payments pending an audit to determine whether payments sought were proper or overpayments had been made. Neither case involves the timing of interim Medicare payments under 42 U.S.C. § 1395g. Kingsbrook, moreover dealt expressly with the question whether judicial review was precluded by another statute in the Medicare Act, 42 U.S.C. § 405(h), and thus was only concerned on appeal with reviewability under § 701(a)(1) of the APA, not § 701(a)(2) as we are here.
 
 
 8
 It is true that there is dictum in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 156-57, 90 S.Ct. 827, 831, 25 L.Ed.2d 184, 189-190 (1970), that indicates that both clauses (1) and (2) of 5 U.S.C. § 701(a) should be read restrictively to require that a statute give "clear and convincing evidence of an intent to withhold" judicial review. Data Processing, supra, 397 U.S. at 156, 90 S.Ct. at 831, 25 L.Ed.2d at 190. But as Professor Davis has pointed out, supra, there are a number of decisions, including Kletschka v. Driver, supra, in which agency action has been held unreviewable in the absence of a clear and convincing showing of legislative intent. K. Davis, supra, § 28.08, at 946-47 (1970 Supp.). He states with his customary authoritativeness that "(a) flat assertion that the dictum in Data Processing is not the law is not too strong." Id. at 947. At the very least the distinction was elucidated in Citizens to Preserve Overton Park, Inc. v. Volpe, supra. The Court analyzed the statute in question under both § 701(a) (1) and § 701(a)(2) and said that with respect to the former there must be either a specific statutory prohibition of review or a " 'showing of "clear and convincing evidence" of a . . . legislative intent' to restrict access to judicial review." Overton Park, supra, 401 U.S. at 410, 91 S.Ct. at 820, 28 L.Ed.2d at 150. The Court then stated with respect to the latter, which concerns us here, that agency action is committed to agency discretion where "statutes are drawn in such broad terms that in a given case there is no law to apply." Id. Given this delineation of the different tests to be applied under § 701(a)(1) and § 701(a)(2), we decline to accept the transportation of the requirement of "clear and convincing evidence of . . . legislative intent" to restrict review from § 701(a)(1) into § 701(a)(2), as was done in dicta in Hein v. Burns, 402 F.Supp. 398, 403 (S.D.Iowa) (three-judge court), appeal docketed, 44 U.S.L.W. 3546 (U.S. Mar. 22, 1976), citing Rockbridge v. Lincoln, 449 F.2d 567, 570 (9th Cir. 1971).
 
 
 9
 No different result in this case is dictated by Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), where rulemaking authority of the Secretary of Agriculture under 16 U.S.C. § 590d(3) was held reviewable under § 701(a)(2) since there the charge was made that the Secretary's definition of the phrase "making a crop" was in conflict with the definition of the statutory term as set forth in the legislative history of the Food and Agriculture Act.[8] Our case involves the challenge to the Secretary's exercise of authority in an area where the statute has granted him broad and undefined discretion with what we perceive to be no "law to apply" existing either in § 1395g itself, in its legislative history or in other statutes.
 
 
 10
 Appellants contend that there is "law to apply" in this case in that the validity of the regulation must be evaluated in the light of provisions of the Medicare Act and the regulations promulgated under it requiring that hospitals be reimbursed the reasonable cost of providing services and prohibiting the shifting of the costs of Medicare beneficiaries to non-Medicare patients. See 42 U.S.C. §§ 1395f(b), 1395x(v)(1)(A).[9] For the purposes of determining this question, we do have the duty of and jurisdiction to review under 28 U.S.C. § 1361, but this does not mean that we may also review the regulation on the basis of whether or not it is arbitrary, capricious or an abuse of discretion. On the contrary, "to the extent" the timing of reimbursement payments is "committed to agency discretion" it is unreviewable. If indeed the timing of reimbursement were in violation of a statutory right it would, of course, be reviewable and to that extent the court below had and we have jurisdiction. See Aquavella v. Richardson, supra, 437 F.2d at 403; Kletschka v. Driver, supra, 411 F.2d at 444.
 
 
 11
 On the question of violation of the statutory requirements appellants' argument is that providers must be reimbursed the "reasonable cost" of services to Medicare beneficiaries and that working capital must be considered an element of "reasonable cost"; the new PIP system by introducing a time lag between the delivery of service and reimbursement allegedly fails to provide for working capital. As we read § 1395x(v)(1)(A), note 9 supra, which defines reasonable cost so as to provide the principles for determining the amount of reimbursement, see 20 C.F.R. § 405.402(b),[10] that statute defines the term as a cost "actually incurred." If appellants incur costs in the form of interest on a loan to obtain working capital, such interest expenses continue to be reimburseable under the new PIP system just as they were before, and there is no conflict between that system and statutory reimbursement principles.
 
 
 12
 Appellants also argue that the new PIP system violates the statutory prohibition against imposing the necessary costs of efficiently delivering coverage services from individuals covered by Medicare to individuals not so covered, 42 U.S.C. § 1395x(b)(1)(A).[11] The argument is that because of the cash flow problems of the New York area hospitals the change in the PIP system will necessitate the borrowing of money to meet current expenses and the interest on such loans will be only partly reimbursed under Medicare. As Judge Metzner noted, however, the challenged regulation does not deal with this problem and the question must await the determination of the amount of reimbursement. In other words, the issue is not ripe. See Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681, 691 (1967). Appellants have not lost their right to judicial review of administrative determination of the proper amount of reimbursement. See 42 U.S.C. §§ 1395g, 1395oo, and 20 C.F.R. Subpart R § 405.1801 et seq. Any decision as to whether reimbursement will amount to 100 per cent of the interest expenses occasioned by the change in the PIP system or indeed would cover only the cost of obtaining working capital that was necessary to deliver covered services to Medicare patients is a matter that must await future determination and review.
 
 
 13
 Having held that to the extent that the timing of reimbursement payments is committed to agency discretion, it is nonreviewable, there is no need and no power for us to determine whether the Secretary arbitrarily and capriciously used his discretion. Judge Metzner correctly applied § 701(a)(1), finding that there was no clear and convincing evidence of legislative intent to preclude review and properly went on to hold that the timing of interim payments was committed to agency discretion within the meaning of § 701(a)(2) because there was "no law to apply." We cannot improve upon his holding and adopt it as our own.
 
 
 14
 Judgment affirmed.
 
 
 
 [1]
 20 C.F.R. § 405.454(j) provides in relevant part:
 Periodic interim payment method of reimbursement. In addition to the regular methods of interim payment on individual provider billings for covered services, the periodic interim payment (PIP) method is available for Part A hospital and skilled nursing facility inpatient services and for both Part A and Part B home health agency services.
 (4) Payment will be made biweekly under the PIP method unless the provider requests a longer fixed interval (not to exceed 1 month) between payments. The payment amount will be computed by the intermediary to approximate, on the average, the cost of covered inpatient or home health services rendered by the provider during the period for which the payment is to be made, and each payment will be made 2 weeks after the end of such period of services. Upon request, the intermediary will, if feasible, compute the provider's payments to recognize significant seasonal variation in Medicare utilization of services on a quarterly basis starting with the beginning of the provider's reporting year.
 
 
 [2]
 42 U.S.C. § 1395g provides:
 The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the General Accounting Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.
 
 
 [3]
 In an unpublished opinion, 75 Civ. 5902, Dec. 11, 1975, Judge Metzner essentially found the proposed regulation to be unreviewable under 5 U.S.C. § 701(a)(2)
 
 
 [4]
 Private organizations, such as health insurance companies, may be authorized by the Secretary of HEW to facilitate payments to hospitals under 42 U.S.C. § 1395h. All but one of the hospitals in this case have elected to use Blue Cross/Blue Shield of New York as their intermediary
 
 
 [5]
 As we noted in the text, supra, hospitals on the old PIP system by no means have been required to convert immediately to new PIP. The original implementation date of the new PIP regulation was extended by the Secretary from September 15, 1975, to May 31, 1976, to lessen the cash flow problem to be experienced in conversion. Under a gradual conversion schedule weekly PIP payments were continued through November, 1975, and then disbursed biweekly in amounts adjusted to contemplate complete conversion by May 31, 1976. Since this gradual ten-month conversion period was allowed all old PIP hospitals excluding appellants (who are still on old PIP), we assume that the Secretary will extend the same aid of a transition period to cushion appellants' cash flow difficulties
 
 
 [6]
 The Judicial Review Chapter of the Administrative Procedure Act, 5 U.S.C. § 701, provides:
 (a) This chapter applies, according to the provisions thereof, except to the extent that
 (1) statutes preclude judicial review; or
 (2) agency action is committed to agency discretion by law.
 
 
 [7]
 It is true that the court in East Oakland-Fruitvale Planning Council v. Rumsfeld, 471 F.2d 524 (9th Cir. 1972), indicated in dicta that despite the unreviewability of the merits of the Director's decision, where legislative history of the statute revealed a clear and specific limitation upon the scope of his discretion, a court could enforce this by separate, limited review solely of the scope of his decision "without entrenching upon the broad area reserved by the statute to the Director's judgment and expertise." Id. at 535. We have been directed to no relevant "clear and specific limitation" upon the Secretary in the legislative history of § 1395g and hence need not consider whether to adopt the East Oakland Fruitvale approach of using limited review in this case
 
 
 [8]
 In Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Secretary's authorization to prescribe regulations "as he may deem proper to carry out the provisions" of the Act, 397 U.S. at 165, 90 S.Ct. at 837, 25 L.Ed.2d at 199, was found not to commit to his discretion the defining of "making a crop" in part because of the eminent suitability to judicial review of such an exercise. In contrast to the unfeasibility of judicial review in Kletschka v. Driver, 411 F.2d 436 (2d Cir. 1969), the Barlow dispute could only ultimately be resolved, stated the Court, "not on the basis of matters within the special competence of the Secretary, but by judicial application of canons of statutory construction." Barlow v. Collins, supra, 397 U.S. at 166, 90 S.Ct. at 837, 25 L.Ed.2d at 199
 
 
 [9]
 42 U.S.C. § 1395f(b) provides:
 The amount paid to any provider of services with respect to services for which payment may be made under this part shall, subject to the provisions of section 1395e of this title, be
 (1) the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title, or (B) the customary charges with respect to such services; or
 (2) if such services are furnished by a public provider of services free of charge or at nominal charges to the public, the amount determined on the basis of those items (specified in regulations prescribed by the Secretary) included in the determination of such reasonable cost which the Secretary finds will provide fair compensation to such provider for such services.
 42 U.S.C. § 1395x(v)(1)(A) provides in part:
 The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. . . .
 
 
 [10]
 20 C.F.R. § 405.402(b) provides in part:
 (C)ertain tests have been evolved for the principles of reimbursement and certain goals have been established that they should be designed to accomplish. In general terms, these are the tests or objectives:
 (1) That the methods of reimbursement should result in current payment so that institutions will not be disadvantaged, as they sometimes are under other arrangements, by having to put up money for the purchase of goods and services well before they receive reimbursement.
 (2) That, in addition to current payment, there should be retroactive adjustment so that increases in costs are taken fully into account as they actually occurred, not just prospectively.
 (3) That there be a division of the allowable costs between the beneficiaries of this program and the other patients of the provider that takes account of the actual use of services by the beneficiaries of this program and that is fair to each provider individually.
 
 
 [11]
 42 U.S.C. § 1395x(v)(1)(A) provides in relevant part:
 Such regulations (establishing the method of determining costs actually incurred) shall (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .