HOSPITAL ASSOCIATION OF NEW YORK STATE, INC., Misericordia Hospital Medical Center, Buffalo General Hospital, the Genesee Hospital, and the Mount Sinai Hospital on behalf of themselves and all other nonprofit hospitals which are members of the Hospital Association of New York State, Inc. and which are reimbursed for Medicaid services rendered to hospital patients, Plaintiffs,

v.

Philip L. TOIA, as Commissioner of Social Services of the State of New York, Robert P. Whalen, as Commissioner of Health of the State of New York, Peter Goldmark, as Director of the Budget of the State of New York, Hugh L. Carey, as Governor of the State of New York, and David Mathews, as Secretary of the U.S. Department of Health, Education & Welfare, Defendants.

No. 76 Civ. 2027.

United States District Court,
S. D. New York.

Oct. 13, 1977.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs; Jacob Imberman, Robert M. Kaufman, Steven S. Miller, Susan C. Rosenfeld, M. William Scherer, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for New York City Health and Hospitals Corp.; Peter F. Nadel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of State of N.Y., New York City, for State defendants; Covington & Burling, Washington, D.C., of counsel.

Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., New York City, for U.S. Dept. of HEW; John M. O'Connor, Asst. U.S. Atty., New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

New York State participates in the Medicaid program and reimburses hospitals for costs incurred in the treatment of Medicaid patients. On August 16, 1976, the Secretary of Health, Education and Welfare approved several amendments to the state plan, including a change in the reimbursement formula. Plaintiffs contend that the Secretary's approval was arbitrary and capricious because the amendments failed to meet the relevant, Federal regulatory standards and because the approval procedure was defective. For the claimed violations of 42 U.S.C. § 1396a(a)(13)(D) and the rules thereunder, 45 C.F.R. §§ 250.30(a), 246.-10(a)(3), they seek relief against the Secretary.

HEW argues that the Secretary's actions are committed to agency discretion, that plaintiffs lack standing to sue, and that the issues are not ripe for review. Accordingly, it moves to dismiss the complaint against the Secretary. For the following reasons, the motion is denied.

I.

▮ The prohibition against judicial review extends to agency action which "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As § 701(a)(2) has been interpreted, a court may not sit in judgment of an agency's decision when: 1) it was made pursuant to a statute that is " 'drawn in such broad terms that in a given case there is no law to apply,' " *Greater New York Hospital Association v. Mathews*, 536 F.2d 494, 499 (2d Cir. 1976); quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970) or 2) " 'congressional intent is discernible to make [the decision] unreviewable,' " *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 303 (2d Cir. 1971), quoting, 4 K. Davis Administrative Law § 28.16 at 965 (Supp.1970) or 3) " 'the subject matter [of the agency's action] is for some reason inappropriate for judicial consideration,' " *Id; Kletschka v. Driver*, 411 F.2d 436, 443 (2d Cir. 1969).

▮ In this case, as to HEW only, the procedural regularity of its action has been challenged; none of the elements, mentioned above, that precludes judicial review is present here.

## 1) NO LAW TO APPLY

The bare instruction of the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(D), that the Secretary "review and approve" state reimbursement plans, is amplified by the Secretary's own regulations, 45 C.F.R. § 250.30(a)(2), which specify the criteria that must be considered when approval is granted or withheld. The path that the Secretary must follow in reaching a decision about a state plan is not unmarked; at the very least, he must measure the proposal against the standards named in the regulations. With these conditions imposed on the approval procedure that is the object of the plaintiffs' challenge, it cannot be said that this is "one of what must be a very limited number of cases where" the statute under which the challenged action was performed is " '. . . drawn in such broad terms that . . . there is no law to apply.' " *Greater New York Hospital Association v. Mathews, supra,* 536 F.2d at 497.[1]

## 2) CONGRESSIONAL INTENT

The government does not argue that Congress intended to shield the question of procedural regularity from judicial review or that Congress intended HEW to be the final arbiter in cases where its own procedures were challenged.

## 3) INAPPROPRIATE SUBJECT MATTER

Read together, 42 U.S.C. § 1396a(a)(13)(D) and 45 C.F.R. § 250.30(a)(2) specifically obligate the Secretary to: (1) "review and approve" state reimbursement schedules, (2) conduct the review in advance of the state's application of those schedules and (3) consider a variety of factors in deciding whether to grant or withhold approval. Here the Hospitals allege that the Secretary unlawfully delegated, to the state, the responsibility for advance approval by sanctifying a plan that was composed largely of "exceptions," the treatment of which had not been ap-

proved in advance by the Secretary. In addition, they contend that to the extent that the Secretary did conduct the statutorily required review, he failed to consider the criteria listed in the Medicaid regulations. The Hospitals argue that though the statute obliges the Secretary to conduct a particular kind of review and the Constitution imposes the more general requirement of due process, the Secretary has ignored both.

Whatever the complexities of the *object* of the Secretary's approval, the *manner* of that approval is, when claimed to offend the Constitution or the statute under which the Secretary acts, a matter peculiarly suited to judicial review. *Greater New York Hospital Association v. Mathews, supra,* 536 F.2d at 499–500; *Langevin v. Chenango Court, Inc., supra,* 447 F.2d at 303–04; *Kletschka v. Driver, supra,* 411 F.2d at 444.

There is no need to address the government's contention that the Secretary's determination that the state plan provides for reasonable cost reimbursement is unreviewable. In the impending trial against the Secretary alone, (the complaint having been dismissed as to the state defendants) we are not called on to reexamine the state plan. Of course, it is true that the statute obliges the Secretary to "review and approve" that plan. However, our inquiry is framed by the *operative* words: in this case, the issue is whether the Secretary did his "job," of reviewing and approving, and whether he did it adequately, that is, neither arbitrarily nor capriciously. The Secretary is not the author, but the editor. The substance of the plan is not in issue except to the extent necessary to determine whether, in approving the proposal, the Secretary gave it the consideration that, as a matter of Constitutional and statutory law, was its due.

## II.

■ Although HEW also questions the Hospitals' standing to challenge the Secretary's claimed procedural dereliction, it

---

1. In *Mathews,* the court found the Secretary's action unreviewable because that action had been authorized by the following statutory language: "[each] provider of services shall be paid, at such time or times *as the Secretary believes appropriate . . .*" [emphasis supplied].

seems clear that such standing exists. Courts that have considered the question have found that participating hospitals are entitled to sue on such a claim. *California Hospital Association v. Obledo,* No. CV 76–903–R, slip op. at 7 (C.D.Cal. Nov. 11, 1976); *New Jersey Hospital Association v. Klein,* Civ.No. 76–64, slip op. at 6 (D.N.J. April 19, 1976). This result seems unassailable. Because, under the Medicaid Act, hospitals are reimbursed by state plans as approved and reviewed by the Secretary, they are vitally concerned with the approval procedure, and therefore, are more than "arguably within the zone of interests to be protected by" the Act's provision for preimplementation review. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 157, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1969).

HEW contends that even if the Hospitals have a sufficient legal interest, they have failed to establish injury in fact, a necessary component of standing. We doubt that the concept of actual injury is applicable to a case such as this. Certainly it does not apply if it is construed to mean that the Hospitals must prove monetary injury to establish standing:

> "[i]t would be a mistake, under these circumstances, to permit the 'injury in fact' requirement to become a vehicle for converting the jurisdictional doctrine of standing into a tool for *sub rosa* decision of the merits of a controversy." *City of Newburgh v. Richardson,* 435 F.Supp. 1049, (S.D.N.Y.1977).

The administrative review required under the Medicaid Act is designed for the protection of those affected by it, and certainly, the Hospitals, prominent members of that class, are subjected to serious injury if the

reviewing body fails to do its job, or does it inadequately. Put another way, the failure properly to conduct the required review (which guarantees that plans which do not meet statutory and regulatory criteria will not be given effect) in itself constitutes injury in fact.

■ Because the Secretary has already conducted the review, the question whether he conducted it properly is ripe for judicial determination.

For the reasons stated above, the Federal defendant's motion to dismiss the complaint is denied.

It is so ordered.

## ON MOTION FOR SUMMARY JUDGMENT

In this class suit by New York State Hospitals (hereinafter, the "Hospitals") claiming violations of the Medicaid Act and regulations by New York State and the Secretary of Health, Education and Welfare, the plaintiffs move for summary judgment against the Secretary of Health, Education and Welfare. The motion is denied.

Familiarity with our earlier opinions in this vigorously contested lawsuit, which arose from the approval of several amendments to New York State's Medicaid plan, is assumed.[1] The amendments included a change in the reimbursement formula, the most significant feature of which was the lowering of the ceiling on reimbursable costs.[2] The amendments became effective when approved by the Secretary of HEW on August 16, 1976. Plaintiffs allege that the Secretary "is in violation of the Medicaid Act and Regulations and the Fifth Amendment to the United States Constitu-

---

1. See *Hospital v. Toia,* 435 F.Supp. 819 (S.D.N.Y.1977) *appeal docketed,* No. 77–6152 (2d Cir., September 13, 1977); *Hospital v. Toia,* 428 F.Supp. 848 (S.D.N.Y.1977); *Hospital v. Toia,* 73 F.R.D. 565 (S.D.N.Y.1976); *Hospital v. Toia,* 76 Civ. 2027 (S.D.N.Y., September 28, 1976).

2. Under both the old state plan and the plan as amended, hospitals were sorted into groups. The unit—"per patient" or "per diem"—cost of each hospital was computed, and the average unit cost of each hospital group was then cal-

culated. In 1975, hospitals were paid 110% of the group average for each unit of Medicaid service that was rendered. Under the 1976 amendments, the maximum was reduced to 100% of the group average. Because it was expected that the new formula would have an adverse impact on some hospitals, the amendments provided for an appeals system, through which individual hospitals could seek relief from the effects of the limit on payments.

tion by failing to insure the State Defendants' compliance with the Medicaid Act and Regulations, and by approving certain regulations adopted by the State Defendants in their calculation of Medicaid hospital reimbursement rates." (¶ 6, Second Amended Complaint). In their memoranda of law, the Hospitals argue that the manner of the Secretary's approval was defective (HANYS Memo at 1, 2) and that the plan he approved was substantively inadequate, because it "concededly excludes from reimbursement, and is largely unrelated to, hospitals' reasonable costs." (HHC Memo at 5, *passim*) Claiming violations of 42 U.S.C. § 1396a(a)(13)(D) and the rules thereunder, 45 C.F.R. §§ 250.30(a); 246.10(a)(3), the Hospitals move for summary judgment against the Secretary.

■ Although the specific claims of the plaintiffs are discussed below, a preliminary observation is appropriate to explain our view as to how the disposition of the motion as a whole should be considered. This is no ordinary case, and plaintiffs' motion for summary judgment is no ordinary motion. The issues are of great public importance and the facts are complex. After reading plaintiffs' memorandum in support of the motion, we understand why they believe, in good faith, that HEW's actions have not met the requirements of the statute or regulations. Nevertheless, it must be said that to expect a court to grant summary judgment in a suit of this kind is to expect too much. In a case of first instance, involving such significant public, financial and social questions, there is, if not an obligation on the court to assure itself of a full understanding of the facts by hearing witnesses, certainly a high desirability that such a procedure be followed. The views expressed in the remainder of this memorandum are necessarily controlled by these considerations.

In pertinent part, the Medicaid Act provides that:

"[a] State plan for medical assistance must . . . provide . . . for payment of the reasonable cost of in-patient hospital services provided under the plan, as determined in accordance with methods and standards . . . which shall be developed by the State and reviewed and approved by the Secretary . . . ." 42 U.S.C. § 1396a(a)(13)(D).

The regulations promulgated under the Act require that HEW approval issue *prior* to the implementation of the offered state plan, 45 C.F.R. § 250.30(a)(2), and that the Secretary's pre-implementation approval procedure take cognizance of, among others, the following criteria:

"(a) Incentives for efficiency and economy;

(b) Reimbursement on a reasonable cost basis; . . .

(d) Assurance of adequate participation of hospitals and availability of hospitals services of high quality to title XIX recipients;" 45 C.F.R. § 250.30(a)(2)(ii).

The Hospitals claim that the Secretary violated these requirements in a number of ways; the contentions are discussed in turn.

I.

*Failure to Consider the C.F.R. Criteria*

[6] First, the Hospitals argue that in granting approval, the Secretary ignored the statutory criteria quoted above, and considered no data related to "reimbursement on a reasonable cost basis," "efficiency and economy," and "adequate participation of [high quality] hospitals." A related claim is that the 100% average system necessarily resulted in some underpayment and that therefore, the Secretary's approval of it was arbitrary and capricious.

A. *Reimbursement on a Reasonable Cost Basis*

The Hospitals take the position that, in approving the plan, HEW gave no consideration to whether it would reimburse reasonable costs. They claim first that none of the documents contained in HEW's written administrative record relates to the issue of reasonable cost, at least as such. "Rather, these documents merely [deal] with the *economic impact* of these amendments on the hospitals . . . ." (HANYS Memo at 8,

emphasis added); second, that insofar as any part of the Secretary's approval relied on oral, *"ex parte"* representations by state officials, the approval was fatally defective.

HEW squarely disputes the Hospitals' first proposition, and points to documents in the administrative record that, though bearing no labels reading "reasonable cost data," relate to the question of reasonable cost, and were apparently relied upon by HEW in determining that the state plan met the pertinent, regulatory criterion (Deposition of Seymour Budoff, Associate Regional Commissioner of Health, Education and Welfare, at 55–56; see, also, Deposition of William McCann, Assistant Commissioner, New York State Department of Health, at 133–36). The sharp factual dispute prohibits the grant of summary judgment on this issue.

■ Moreover, we disagree with the Hospitals' second contention, above. Nothing in the Medicaid statute or in general law prevents HEW from relying on oral, *ex parte* representations when, as here, it acts in neither an adjudicatory, nor a rulemaking capacity. *Camp v. Pitts*, 411 U.S. 138, 141 n. 3, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); 1 K. Davis, Administrative Law, § 4.04 at 274–78 (1958). In a case in which the agency acts merely to review and approve, a reasonable construction of the term "administrative record" may include all communications relating to the subject matter, received and considered by the Secretary (or his delegates) in the course of his review, or reasonably used by him in determining whether to approve.[3]

Regarding the issue of reasonable cost, HEW is also charged with having acted arbitrarily and capriciously in approving, under any set of procedures, a plan that incorporated the 100% average. This ceiling, claim the Hospitals, was congenitally defective: that is, it was bound to result in inadequate reimbursement for some, and perhaps many, hospitals, and therefore, by definition, could not produce reasonable cost reimbursement. We cannot accept the proposition that the 100% average is guaranteed to fail: that is, it is not inevitable that the average must produce inadequate reimbursement.[4] However, as indicated in the memorandum filed concurrently herewith, disposing of the federal defendant's motion to dismiss for lack of jurisdiction, on the trial as to HEW alone, the merits of the 100% average are not before us. The issue is, rather, whether, in light of the lowering of the ceiling, the Secretary's pre-approval review was adequate, that is, not arbitrary and capricious.

### B. Efficiency and Economy[5]

■ The Hospitals complain of HEW's failure to consider properly whether the

---

3. For example, HEW met with state representatives on August 3, 1976 and August 12th (Dennis Coughlin, Acting Deputy Regional Commissioner of Health, Education and Welfare, Affidavit at ¶¶ 2, 5, attached as Ex. D to Imberman Affidavit; HANYS Memo. at 21–24) at which time the proposed amendments were discussed and the question of reasonable cost was, apparently, explored (Report of Meeting of August 12, 1976 between State officials and HEW, attached as Ex. J to Imberman Affidavit; ¶ 2, Coughlin Affidavit). Before it can be said that the Secretary's approval was arbitrary and capricious in its failure to consider reasonable cost, the attention given to that criterion at those meetings must be determined.

4. Theoretically, the 100% ceiling can generate full reimbursement. For example, if the hospitals in each group were identical, all group members would have the same unit cost, and payment based on the average unit cost for the entire group would result in full compensation.

Consideration of this ideal system suggests the questions of fact that must be answered before the virtue or vice of the ceiling can be judged, and therefore, before the Secretary's approval of it can be labelled as either appropriate, or arbitrary and capricious: that is, whether the groupings were sufficiently refined so that the impact of the ceilings on non-conforming group members was statutorily acceptable (Report of Meeting at 3; HANYS Memo. at 71–75), and whether the Secretary was satisfied that those Hospitals that would be more than minimally underpaid were being justifiably penalized for unreasonable costs.

5. The government argues that insufficient attention to the problem of reasonable cost is the only procedural irregularity which the Hospitals may now prosecute. The right to complain of other irregularities is said to have been waived by the Hospitals' failure to raise them during the period of pre-implementation review.

state plan provided "incentives for efficiency and economy." 45 C.F.R. § 250.-30(a)(2)(ii)(a). The Hospitals do not argue that the factor of efficiency was literally ignored, but that HEW gave its approval to a plan which, in taking "a meat-ax approach to reducing hospital reimbursement," was "not designed to induce efficiency." (HANYS Memo at 13; see, also, HHC Memo at 43: "[T]he 100% ceilings do not isolate inefficiently incurred costs from those efficiently incurred.") HEW argues that it did consider the question of efficiency (indeed, as has been mentioned, plaintiffs concede this), which it contends was subsumed under the question of reasonable cost reimbursement (HEW Memo at 12). Indeed, it appears that the question of efficiency was at least explored in connection with the analysis of the theory and practice of the 100% average:

> "These two provisions [lowering the ceilings] introduce a *'prudent buyer'* concept into hospital reimbursement. Under this concept, when a provider pays more than a prudent and cost conscious buyer would pay for a product, the excess of the prudent buyer's price is not reimbursable. By determining the group average and comparing hospitals to their peers, in terms of cost, one may make gross judgments as to that hospital's efficiency.

> "To the extent that a hospital has costs . . . which are in excess of its peers, it is reasonable to require that hospital to justify its higher costs. The prospective rate setting system by its very nature provides advance notice to hospitals of what their reimbursement rate will be, and enables them to take appropriate steps to avoid unnecessary costs." ¶ 5, Findings and Reasons of Dennis Coughlin, Acting Deputy Regional Commissioner of Health, Education & Welfare (attached as Ex. D to Imberman Affidavit).

Fairly construed, plaintiffs' contention in this case is that HEW ignored obligations imposed by statute and regulations; failure to remind HEW to do its duty is not a waiver of the right to complain of the dereliction.

See, also, Budoff Deposition at 389: "The ceiling is the incentive [for efficient operation];" and Report of Meeting of August 12, 1976 between State officials and HEW, which is attached as Ex. J to Imberman Affidavit, at 3–4.

The obvious conflict between plaintiffs' claims on the one hand and references in the administrative record to consideration of efficiency and economy on the other constitutes a bar to granting summary judgment on the issue. However, of course, the question ultimately to be determined will not be whether HEW considered the criterion at all, but whether the weight and attention which it accorded the subject is or is not to be regarded as arbitrary or capricious.

## C.  Adequate Participation

As the record now stands, plaintiffs have made a strong case for their claim that HEW failed to examine the impact of the amendments on the continuing participation of hospitals and the availability of high quality service. 45 C.F.R. § 250.-30(a)(2)(ii)(d). Indeed, Budoff fairly concedes that the written administrative record contains no document explicitly related to the issue of "participation" (Budoff Deposition at 540–43). Nevertheless, in light of Budoff's insistence that this criterion was "a yardstick against which the methodology was measured," (Budoff Deposition at 542) and the Federal defendant's argument that the question of "participation" was implicit in the issue of reasonable cost reimbursement (HEW Memo at 12, 22, 30), these questions remain: whether this factor was duly—if not explicitly [6]—considered, and how it was that HEW satisfied itself that the State plan was adequate in this regard.

6. The crucial question is whether the problem of participation was explored, and not what label was attached to this aspect of the Secretary's review. See, *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 632 (2d Cir. 1976).

## II.

*The Appeals System*

■ The second theme of the plaintiffs' attack is that in violation of the requirement of advance approval, the Secretary did not sanction a discrete "plan," but rather, an incomplete proposal by which the state would parcel out subsidies on an *ad hoc* basis. The argument goes that because so many appeals were anticipated (as a result of the lowered ceiling on payments), reimbursement could not properly be conceived as issuing under the plan, but would be computed in most instances as exceptions, to be processed through the appeals system. The Hospitals also contend that the appeals system as presented to HEW was so ill-defined that it was arbitrary and capricious for the Secretary to approve it. Moreover, the Hospitals claim that it was a fatally defective procedural irregularity for the Secretary to rely, even in part, on oral assurances from state officials in approving the appeals portion of the plan.

HEW understood that the new ceiling might have an adverse effect on many of the participating hospitals (Budoff Deposition at 112, 567, 569; Report of Meeting at 3–5). In order to soften the impact and grant relief to hospitals whose costs, though reasonable and legitimate, nevertheless exceeded the proposed 100% average, HEW insisted that the state plan include an appeals system sufficient to meet the needs created by the change in regulations.[7]

According to the Hospitals, HEW knew that the majority of the participating hospitals, would be inadequately reimbursed as a result of the lowered ceiling, and would therefore be remitted to the appeals system (Budoff Deposition at 567–68), so that ultimately, reimbursement would not be computed pursuant to the "plan" that HEW approved, but would be determined on a case by case basis by the state. By shunting the hospitals to the appeals system, HEW is said to have unlawfully delegated its statutory responsibility for approving the "plan" prior to its implementation. 42 U.S.C. § 1396a(a)(13)(D).

The claim that HEW anticipated that 61% of the hospitals would suffer as a result of the 100% ceiling, and would therefore appeal, is crucial to the Hospitals' charge of abrogation. This figure is in dispute, for it appears from the "Report of Meeting" that HEW was advised that 30%—not 61%—would experience some financial disappointment.

Be that as it may, the role of the appeals system cannot be judged by gauging the raw percentage of hospitals that were adversely affected, since, for example, hospitals experiencing minor underpayment may not have been expected to appeal. Indeed, of those hospitals whose costs exceeded the new ceiling, most were portrayed by the state as suffering only a 2% loss (the difference between actual and reimbursed costs). (Report of Meeting at 3; ¶ 5 Coughlin's Findings and Reasons) The question remains whether the Secretary fairly believed that the number of appeals taken and the stakes of those appeals would be minimal, and, if so, whether he may be found to have approved a "plan," despite the fact that the appeals system was still unresolved in detail at the time he rendered approval.

Another refrain in the attack upon the appeals provision is that the Secretary failed to consider its mechanics: the state's ability to handle the expected case load, and the standards that would be applied to the disposition of an appeal. Scattered

---

7. The appeals provision reads as follows:

"86.17 Revisions In Certified Rates. (a) The State Commissioner of Health may consider only those applications for prospective revisions of certified rates which are based on

(7) requests for relief from ceiling provisions of section 86.14 of this part. For such relief, a medical facility must demonstrate that its range of approved services, patient mix, lengths of appropriate stays and other pertinent factors are direct causes for all or part of the costs in excess of the routine or ancillary ceilings. Such relief shall not result in a rate which exceeds that based on maximum reimbursable State standards, unless a waiver of such standards is granted by the commissioner. If relief is granted, the resulting revised rate shall become effective as of the first day of the rate period."

throughout the transcript of Budoff's deposition is testimony that HEW was concerned, and ultimately satisfied that: (1) the Hospitals would be provided with information necessary for the prosecution of an appeal on any one of the grounds listed in § 86.17(7) and (2) the state's staff would be sufficient for the task of processing the number of appeals that were anticipated. (See, e. g., Budoff Deposition at 169, 182, 570). As for the Hospitals' contention that the standard of review does not appear on the face of the appeals provision, it cannot be said that the absence of that detail invalidates the Secretary's approval of the appeals procedure, especially in light of Budoff's testimony that HEW examined the proposed system to guarantee that it provided due process. (Budoff Deposition at 299–304) The issue of fact left for trial is whether, in light of the documentary and oral[8] representations made by the state, HEW's decision that the appeals system was workable and well-defined was or was not arbitrary and capricious.

### III.

### The Medical Advisory Committee

[10] The Hospitals contend that the state's conceded failure to consult the New York Medical Advisory Committee ("MAC") prior to adoption of the amendments (see Budoff Deposition at 607; Coughlin Deposition at 296–97) compels summary judgment in their favor. The failure is alleged to constitute a violation of 45 C.F.R. § 246.-10(a)(3), which provides that:

> "(3) The medical care advisory committee will have adequate opportunity for meaningful participation in policy development and program administration, including the furtherance of recipient participation in the program of the agency."

HEW responds that the State Hospital Review and Planning Council ("HRPC") was consulted prior to the submission of the amendments (¶¶ 1, 5 Affidavit of Frank Cicero, M.D., Second Deputy Commissioner,

New York State Department of Health) and that that consultation substantially complies with the regulations. Without now deciding whether MAC was required to perform the function of the committee named in § 246.10(a)(3), we find that a question of fact exists as to whether, under the circumstances of this case, the involvement of HRPC substantially satisfied the pertinent Medicaid rule.

If it did not, a question remains as to the effect of the violation of the regulation; for example, whether the failure to consult with the statutory committee would amount in this case to a violation of sufficient magnitude to mandate an overturning of the approval, or whether it would merely lay the predicate for a compliance hearing. 42 U.S.C. § 1396c; 45 C.F.R. § 201.6(a)(2). Plaintiffs cite *Benton v. Rhodes,* ¶ 28,025 C.C.H. Medicare and Medicaid Reporter (1976–77 Transfer Binder) (S.D.Ohio 1976) and *Robinson v. Maher,* ¶ 27,707 C.C.H. Medicare and Medicaid Reporter (1976–77 Transfer Binder) (D.Conn.1976) as authority, that violation of the rule requires invalidation of the Secretary's approval. Neither case stands for the proposition that a state's failure to consult a medical advisory committee is fatal to HEW approval. Rather, they hold that such an omission entitles the plaintiffs to seek an injunction against the State, on the grounds of non-compliance.

### IV.

### The State Budget Director

As a final basis for claiming that the Secretary's approval was arbitrary and capricious, the Hospitals argue that because the state budget director had power to disapprove rate revisions that might result from appeals (Public Health Law § 2807(2-a)), the plan did not guarantee reimbursement of reasonable costs. Without deciding whether the Director's withholding of funds could survive invocation of the Supremacy clause (Art. VI, U.S. Constitution), it should

---

8. To the extent that HEW relied on oral assurances by state representatives that the system would function properly, the Hospitals claim a procedural violation. For the reasons stated above, *supra,* at 5, we are unwilling to find such action to constitute a violation.

be noted that the theoretical possibility of state impedance does not bear on the propriety of the Secretary's approval; at the most, it raises a potential compliance issue.

For the reasons stated above, plaintiffs' motion for summary judgment is denied in all respects.

It is so ordered.