HOSPITAL ASSOCIATION OF NEW YORK STATE, INC., Misericordia Hospital Medical Center, Buffalo General Hospital, the Genesee Hospital, and the Mount Sinai Hospital on behalf of themselves and all other nonprofit hospitals which are members of the Hospital Association of New York State, Inc. and which are reimbursed for Medicaid services rendered to hospital patients, Plaintiffs,

v.

Philip L. TOIA, as Commissioner of Social Services of the State of New York, Robert P. Whalen, as Commissioner of Health of the State of New York, Peter Goldmark, as Director of the Budget of the State of New York, Hugh L. Carey, as Governor of the State of New York, and David Mathews, as Secretary of the U. S. Department of Health, Education & Welfare, Defendants.

No. 76 Civ. 2027.

United States District Court,
S. D. New York.

April 25, 1979.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for the New York City Health and Hospitals Corp.; Peter F. Nadel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, for State defendants; Covington & Burling, Washington, D. C., of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. of New York, New York City, for U. S. Dept. of Health, Ed. and Welfare; John M. O'Connor, Asst. U. S. Atty., New York City, of counsel.

LASKER, District Judge.

One of the results of the explosion of medical knowledge in the past century has been a radical increase in the expenditure of resources for cure, prevention and research. At least in part because increasingly sophisticated medical processes and techniques are more costly, and because this is an age of developing social programs, a wide variety of regulated plans now exist to finance the care of the sick. In some countries the plans provide comprehensive care of all sickness regardless of the age or economic circumstances of the patient. In this country, the two governmentally financed plans are Medicare (Pub.L. 89–97, Title I, July 30, 1965, which provides health insurance for the aged) and Medicaid (42 U.S.C. § 1396 *et seq.*) intended to assist the medically indigent, who are defined by statute as "families with dependent children and . . . aged, blind or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services."

This case deals with significant questions arising under the Medicaid statute. To put the issues in perspective a review of the checkered history of the case is necessary.

THE BACKGROUND

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs; Jacob Imberman, Robert M. Kaufman, Steven S. Miller, Susan C. Rosenfeld, M. William Scherer, New York City, of counsel.

Congress enacted the Medicaid statute in 1966 as Title XIX of the Social Security Act (42 U.S.C. § 1396 *et seq.*). The program is administered by the states pursuant to statute and regulations of the federal Depart-

ment of Health, Education and Welfare (HEW). Under § 1396a(a)(13)(D) providers of inpatient hospital services, such as the plaintiffs here, are entitled to reimbursement by the states for the "reasonable cost" of their services, "as determined in accordance with methods and standards . . . reviewed and approved by the Secretary and . . . included in the [state Medicaid plan]." The ultimate cost of Medicaid reimbursement to hospitals is shared equally between the state and the federal government.

Since 1970, New York State has used a prospective methodology to compute the reimbursable "reasonable costs" of hospitals. The system attempts to predict costs for a forthcoming year and is part of the State Medicaid plan. Normally, at the end of each calendar year, the State publishes reimbursement rates for each hospital group[1] for the forthcoming year. However, at the end of 1975, faced with rising hospital costs and its own financial instability, New York took action, by issuance of interim rates which in essence froze the 1975 rates.

In May, 1976, the plaintiffs, a class consisting of 270 voluntary and public hospitals in New York State, brought this suit claiming that the freeze was illegal because it 1) amended the State plan without approval by the Secretary of HEW as required by 42 U.S.C. § 1396a(a)(13)(D) and 2) deprived them of reimbursement of their "reasonable costs."

In July, 1976, the State promulgated a revised formula for determining the 1976 rates. The revision included significant changes in the earlier method of computation. In particular, 1) it lowered the ceiling on reimbursable costs for "routine" inpatient services from 110% to 100% of the average of the costs for the group of hospitals to which the hospital being reimbursed belonged; 2) for the first time it imposed a ceiling (of 100% of average) on reimbursement for "ancillary" inpatient costs; and 3) it reduced to 90% the earlier 100% reimbursement of salaries of interns and residents.

On July 16, 1976, the plaintiffs amended their complaint to specify objections to the new formula and moved to restrain the defendants from implementing the amendments until they were approved by HEW. An injunction granting that relief was issued August 2, 1976.

\* \* \* \* \* \*

Effective January 1, 1976, Congress had required states participating in the Medicaid program to consent to suits in federal court by hospitals which claimed that the state was not in compliance with the reimbursement requirements of the statute (see 42 U.S.C. § 1396a(g)). Pursuant to this statute, but under protest, New York had executed a consent to suit. On October 18, 1976, the mandatory waiver of immunity provisions were repealed "effective January 1, 1976." (Pub.L. 95–452) Upon the enactment of the repealing statute, the State moved, under the Eleventh Amendment, to dismiss the suit as to itself. The motion was granted by this court, *Hospital Association of New York State, Inc. v. Toia*, 435 F.Supp. 819 (S.D.N.Y.1977) *aff'd*, 577 F.2d 790 (2d Cir. 1978). The Secretary of HEW concurrently moved to dismiss on the grounds of mootness but that motion was denied since HEW's role in the approval process was found to be "capable of repetition, yet evading review," within the rule of *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); and *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969).

*Governing Law*

42 U.S.C. § 1396a(a)(13) provides that: "A State plan for Medical assistance must . . . provide . . . for payment of the reasonable cost of inpatient hospital services . . . in accordance with methods and standards . . . developed by the State and reviewed and approved by the Secretary . . . ."

---

**1.** See note 4, *infra*.

The Secretary has specified criteria by which the approvability of a state plan is to be determined:

". . . criteria for approval will include:

(a) Incentives for efficiency and economy;

(b) Reimbursement on a reasonable basis: . . .

(d) Assurance of adequate participation of hospitals and availability of hospitals services of high quality to title XIX recipients . . ."

\* \* \* \* \* \*

"(a) *State plan requirements:* A State plan for medical assistance under title XIX of the Social Security Act must:

. . .

(2) Provide for payment of the reasonable cost of inpatient hospital services as determined in accordance with methods and standards, consistent with the provisions of section 1122 of the Social Security Act for participating States which shall be developed by the State . ." (45 C.F.R. 250.30 (1976).

The hospitals contend that HEW's review and approval of the State plan were arbitrary and capricious in giving inadequate attention to the statutory and regulatory criteria for approval and that HEW's conclusions that the criteria were satisfied were based on clear errors of judgment. *See Hospital Association of New York State, Inc. v. Toia,* 438 F.Supp. 866 at 879 *et seq.* (S.D.N.Y.1977). To understand how the regulatory criteria were applied in reviewing the New York State system, it is necessary to describe how the State computed reimbursement rates in 1976, and how HEW went about reviewing the validity of the plan.

*How the Plan Works*

The prospective reimbursement system works in the following manner.[2] In the "base" year, which is two years prior to the payment, or "rate," year, the State compiles the actual inpatient costs for all of its Medicaid hospitals. On the basis of this compilation, the State computes allowable costs (described below), and these are used to determine how much hospitals will be paid at the beginning of the rate year.

The first step in the derivation of allowable costs is the computation of the average costs (routine and ancillary) that each hospital incurs in treating a Medicaid patient. To obtain this average, the state divides each hospital's total routine costs by its total patient days, and divides each hospital's total ancillary costs[3] by total patient discharges.

Every hospital's average cost is then compared with the average cost of other hospitals in its peer group.[4] The comparison yields an average for the entire group, the "group average" (sometimes referred to as the "ceiling"). After the disallowance of costs in excess of the group average, if any, each hospital's allowable costs (routine and ancillary) are, with some additions, "trended forward" to compensate for inflation, and, with the addition of allowable capital costs and the conversion of the total costs to per diem amounts, become the hospital's Medicaid reimbursement rate in the rate year.[5]

As stated above, in 1976 the amount of the prospective ceiling was set exactly at

2. The basic amended plan, "submittal 76-28," can be found in PX-1 at 1-40. In the course of consultation and negotiation with HEW—leading up to the final approval—the basic plan was supplemented by other submittals and attachments.

3. Routine costs are those arising from services that are provided to all patients (such as nursing and housekeeping). Ancillary costs arise from special services rendered for the particular needs of an individual patient (operating room, chemotherapy, etc.) (Tr. 61).

Certain categories of routine and ancillary costs (such as bad debt expenses) are not reimbursed by the Medicaid program and, hence, are excluded from this calculation.

4. Hospitals were grouped according to the similarity of four characteristics: size, ownership, geographic location and teaching/non-teaching (Tr. 59-60, 143).

5. Hospitals are reimbursed their costs as billed, if lower than the ceiling. However, except where an appeal is allowed (see text at footnote

the average. That is, every hospital was to receive no more than 100% of the trended, base year group average. This marked a substantial change over 1975, when hospitals' rate year maximum reimbursement was set at 110% of their peer group's average per diem cost. Furthermore, under the 1976 plan, the 100% ceiling on prospective payments was applied to both routine and ancillary costs. In 1975, only routine costs had been subjected to the ceiling. Also, the 1976 plan reduced reimbursement of interns' and residents' salaries from 100% to 90%. Finally, the 1976 plan contained an expanded appeals provision,[6] which permitted hospitals to recoup, upon a proper showing, the costs that were disallowed as being in excess of the ceiling.

### HEW Review Process and Rationale of Approval

Pursuant to its statutory and regulatory obligations, HEW reviewed and approved the 1976 amendments (although the approval was issued after they had been put into effect). The review process began shortly after HEW received the amendments, in December, 1975. This review consisted of analysis by the HEW regional staff, as well as correspondence and meetings with both the State and HEW's central office in Washington, D.C. Moreover, although there was no statutory or regulatory obligation to do so, HEW kept the Hospital Association of the State of New York, Inc. ("HANYS") abreast of the amendments being proposed by the State, and solicited and received from HANYS detailed statements, as well as live presentations, of HANYS' views with regard to the proposed changes.

In its review of the 1976 amendments, HEW focused on the projected "impact" of the lowered ceilings, which, as indicated above, limited prospective reimbursement of routine and ancillary Medicaid costs to 100% of the group average and disallowed 10% of the salaries of interns and residents. In an array of tables (PX–1 at 86–120, 162–205, 978–1061, especially, 115–120, 999–1000, 1008–12, 1058–61) the State provided statistics that variously represented the effect of the lowered ceilings by showing: the absolute difference between each hospital's Medicaid costs and the Medicaid ceilings, (the difference is known as the Medicaid Disallowance); that difference expressed as a percentage of the hospital's total inpatient cost,[7] and a comparison of the 1975 and 1976 Medicaid reimbursement rates.

What the State's tables purported to show was that, when expressed in percentage terms, the impact of the lowered ceilings would, for approximately 90% of the hospitals, be a Medicaid Disallowance of between 0 and 2% of total inpatient cost.[8] (PX–1 at 116) For HEW, this statistic was crucial: there is no dispute that the agency's conclusion that the plan measured up to the statutory and regulatory criteria[9] was based on its view that the impact of the 100% average ceiling was minimal[10] and that hospitals that were dissatisfied with their rate of reimbursement could appeal. Seymour Budoff, an Associate Regional Commissioner at the time of approval, broadly summarized HEW's rationale:

> ". . . to the extent [that] the hospital had costs above the peer group average which it could justify, it would get

6) they are reimbursed at a rate no higher than the ceiling even if their costs are greater.

**6.** Section 86.17(a)(7), PX–1 at 349–50.

**7.** This figure represents ". . . the hospital's total expenditures for all patients . . ," (Tr. 918), "the total cost . . . that a hospital incurs in treating all of its patients." (Tr. 2818).

**8.** For 40% of the hospitals, the lowered ceilings would result in no disallowance; for an additional 42%, the disallowance would be for less than 1%; an additional 8% of the hospitals would experience a disallowance of less than 2%; and an additional 3% of the hospitals would have disallowances of less than 3%.

**9.** The criteria are quoted in the text at pages 920–921 *supra*.

**10.** See Tr. 214, 387–88, 853, 1151, 2376—reasonable cost in terms of impact; *id.* at 132–33, 826–27, 853, 929–30, 1174–76; 1180, 2302–06, 2316–19—adequate participation/quality care in terms of impact; *id.* at 1140, 2305, 2315–16, 2825—efficiency economy in terms of impact.

those costs reimbursed [on appeal] and to the extent that the costs . . . were above the group average . . . and were inefficiently produced . . . the hospital through prudent management would reduce those costs and not have a deficit . . . [I]n the aggregate . . . [the] impact was about two percent of total inpatient cost, which seemed like an attainable goal for the hospitals to reach." (Tr. 2688–89).

In somewhat more detail, HEW's conclusion was reached in the following manner. First, with regard to its decision that the 1976 plan satisfied the reasonable cost criterion, HEW viewed the amendments as giving rise to a two-phased reimbursement system. The first phase was the prospective one, in which, at the beginning of the rate year, each hospital would receive reimbursement on the basis of 100% of the base year group average. HEW decided that a plan that, at worst, inflicted a disallowance of 2% of total inpatient cost provided reimbursement on a reasonable basis. This decision was based on a number of factors. First, to the extent that the disallowance represented a penalty on costs that exceeded a hospital's *peer* group's *average* cost, HEW viewed the disallowance as a prohibition of inefficient costs (Tr. 762–63, 765, 2261, 2688–89; see also, *id.* at 2276, 2311, 2365) which, under the Medicaid statute and regulations, are not subject to reimbursement. HEW considered the conclusion that above-ceiling costs were inefficient to be supported by its judgment that there was universal inefficiency within the hospital industry (Tr. 385–89, 2307, 2697–99; see also, *id.* at 2275). Moreover, HEW concluded that whatever the reason a hospital's costs exceeded the ceiling, the State plan provided a safety valve for those hospitals for which imposition of the 100% average resulted in reimbursement of less than the reasonable cost of their services: they could appeal. In HEW's judgment, the State plan's appeals process gave all hospitals an opportunity to justify their above-average costs; upon a showing that these costs were not the result of inefficiency, hospitals would recoup the amount of the disallow-

ance. HEW believed that it was fair to remit the hospitals to the appeals procedure to recover what, for more than 90% of the hospitals, was a relatively small sum.

As for the requirement that the State plan provide for "adequate participation of hospitals" and the availability of "services of high quality," HEW concluded that since, participation and quality of care had been excellent, under the prior plan, the minimal impact would neither drive hospitals away from the Medicaid program nor force a significant reduction in the quality of service.

With regard to incentives for efficiency and economy, HEW concluded that once it received notice of its projected, rate year payments and its disallowance (if any), a hospital would institute measures to trim unnecessary "fat" from its costs.

*Plaintiffs' Attack on HEW's approval*

■ In particular, the hospitals challenge (1) HEW's reliance on the State's "impact tables," which, they claim, were generated by an incorrect formula and (2) HEW's approval of the appeals system, which is said to have been inchoate at the time the State presented it for agency review. Other objections to HEW's approval are that:

to the extent that the agency's approval was based on a presumption of industry-wide inefficiency, the presumption was both impermissible and unfounded,

both the methods used to construct peer groups (from which the per diem group average was computed) and the statistical formula for determining the group average were faulty; the impact tables excluded cost data from hospitals belonging to the New York City Health and Hospitals Corporation ("HHC"),

the cut in reimbursement of interns' and residents' salaries was thoughtlessly made and thoughtlessly endorsed,

use of the 100% ceiling would, over a period of years, create a continuously declining rate of reimbursement, and

the State's failure to submit the plan to the State medical advisory committee

("MAC") prior to presenting it to HEW should have warranted HEW's rejection of the amendments.[11]

### The Legal Framework of the Case

·Before proceeding to findings with respect to plaintiffs' claims, it is necessary to define the legal framework within which the findings are made, and, to this end, a certain amount of procedural history must be recited.

The hospitals' pleadings in this action contained allegations against both the State and HEW. Against the State, it was claimed that the 1976 plan was substantively inadequate; and, as has been discussed above, the charge against HEW was that its review and approval procedures had been faulty.

The case against the State was ultimately dismissed as moot. Memorandum opinion of November 17, 1978, aff'd, *Hospital Association of New York State, Inc. v. Toia,* 577 F.2d 790 (2d Cir. 1978). The case against HEW was retained: against the agency's argument that the Secretary's approval was a matter committed to agency discretion

(and therefore, judicially unreviewable), we ruled that the manner in which the Secretary reached the decision to approve was a proper subject for judicial review, *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 868–69, and that the approval methods were capable of repetition but evading review. *Southern Pacific Terminal Company v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911). The decision that the manner of approval was judicially reviewable was based primarily on the existence of agency regulations, 45 C.F.R. 250.-30(a)(2)(ii), that listed explicit criteria [12] to be considered in the approval process; it was proper for the court to determine whether the Secretary had considered the criteria (and whether his consideration was adequate) in reaching his decision to approve the plan.

The parties were informed, both orally (at numerous pretrial conferences) and by way of opinion issued in connection with plaintiffs' motion for summary judgment and defendant's motion to dismiss, that in the case against HEW, the merits of the

11. With regard to all of the plaintiffs' objections, the government argues that to the extent they may be construed as complaints of failure to consider the governing statutory and regulatory criteria, those complaints which were not brought to the agency's attention prior to its approval may not now be invoked to overturn the agency's action. This argument was earlier made and rejected, *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 872, n. 5—HEW cannot delegate its obligation to observe applicable statutes and regulations, *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1385 (2d Cir. 1977)—and nothing now submitted by HEW adds to the arguments made before the earlier ruling. Specifically, HEW's reliance on two cases involving agency rulemaking, *State of New York v. United States,* 568 F.2d 887, 897–98 (2d Cir. 1977); *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 330, 486 F.2d 375, 397 (1975) is misplaced. In those cases, the courts refused to judge challenged agency actions in light of substantive submissions that had not theretofore been presented to the agencies, since to have done so would have both usurped the agencies' role and unfairly held them responsible for the assimilation of information that had become available only after the challenged decisions. (That is, since rulemaking is generated by an exchange of views

and data between the agency and the relevant community, as opposed to deriving from any pre-existing source, a rule may only be judged on the basis of material actually exchanged.) In the instant case, the criteria upon which the agency action is challenged existed prior to HEW's decision, and holding the agency to them is nothing more than requiring compliance with the law.

Citation of *National Labor Relations Board v. Newton-New Haven Company,* 506 F.2d 1035, 1038 (2d Cir. 1974) is similarly unhelpful to HEW's argument. That case reiterated a long standing rule that objections to procedural due process defects are waived if not raised during the challenged procedure. No such objection is in issue here.

12. As is apparent from our earlier opinion, the express criteria of the C.F.R. also give rise to implicit standards. For example, the requirement that the Secretary approve the State's plan *in advance* of its implementation may be read as an injunction against the Secretary's approving a "plan" which is to be worked out by the State, on an ad hoc basis, during the course of implementation. See *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 874–75.

1976 plan—long since altered—and the correctness of the Secretary's conclusions about that plan were not at issue:[13] the sole issue which remained for trial was whether HEW had properly discharged its statutory and regulatory obligations in reaching its conclusions.

This issue whether the Secretary had properly considered the relevant criteria was designated one of "procedure," and the designation was intended to underscore our refusal to review the merits of the State plan. To a certain extent, both parties have misapprehended our earlier rulings on this point.

In its post-trial brief, the government argues that the only question before the court is:

> "the narrow procedural issue: whether HEW violated the Administrative Procedure Act or the Due Process clause by failing to adhere to a required procedural mandate, such as opportunity to be heard, etc." (HEW Brief at 190)[14]

The government goes on to argue that since the Secretary's approval constitutes informal decision making as opposed to adjudication or rule making (See 5 U.S.C. §§ 553, 554, 556, 557), the Administrative Procedure Act does not impose any procedural standards on the Secretary. Neither, claims the government, do the Medicaid Act or the regulations thereunder. Finally,

HEW argues that the due process clause of the Fifth Amendment does not apply (HEW Brief at 218, citing *Langevin v. Chenango Court,* 447 F.2d 296, 300–302 (2d Cir. 1971)) and that in any event, the hospitals did not press the due process claim at trial.[15]

Satisfied that all relevant procedures were complied with and pointing out that the court may not impose additional procedures and then sanction the agency for not having followed them, *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978),[16] the government urges that there is no basis for overturning the Secretary's actions.

In sum, HEW's argument is as follows:

1. This court earlier ruled that the only issue against HEW was a narrow one of procedural due process.

2. No procedural due process claims may be asserted against the Secretary because none of the applicable statutes or regulations imposes any procedural due process requirements upon the Secretary's approval.

3. *Vermont Yankee* precludes imposition by the court of any additional procedural requirements.

 Despite its internal consistency, the government's argument on this point is

---

**13.** Because review of the Secretary's *conclusion* would have lead unavoidably to a consideration of the merits of the defunct 1976 State plan, such review would have been moot and of no value. Also, the conclusion itself, as opposed to the manner in which the Secretary reached the conclusion (that is, whether or not he attended to the applicable C.F.R. criteria)— involves complex technical considerations that may well be an inappropriate subject for judicial scrutiny. *Kletschka v. Driver,* 411 F.2d 436, 443 (2d Cir. 1969).

**14.** This contention ignores the fact that our earlier use of the term "procedure" occurred in connection with the question whether HEW had properly considered the relevant C.F.R. criteria. *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. 866, *passim.*

**15.** HEW brief at 217.

**16.** In *Vermont Yankee,* the Court of Appeals had "examined the [contested] rulemaking proceedings and, despite the fact that it appeared the agency [had] employed all the procedures required by 553 and more, the court determined the proceedings to be inadequate and overturned the rule" 435 U.S. at 535, 98 S.Ct. at 1207. The Supreme Court reversed the decision of the Court of Appeals and reasserted the rule

> ". . . that generally speaking . . . section [553] of the [Administrative Procedure] Act established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures. Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." 435 U.S. at 524, 98 S.Ct. at 1202 (footnote omitted)

incorrect because it ignores what was specified as the single remaining issue in the case (in which HEW is the sole remaining defendant): whether the Secretary's approval was based on due consideration of the criteria established by the C.F.R. Accordingly, the question for decision is whether the Secretary's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[17] Judged by this standard, the issue is whether the agency acted without taking account of all "relevant factors, and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe, infra,* 401 U.S. at 416, 91 S.Ct. at 824; *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 251 (2d Cir. 1977); *Hooker Chemicals & Plastics Corp. v. Train,* 537 F.2d 620, 630–31 (2d Cir. 1976); *American Meat Institute v. Environmental Protection Agency,* 526 F.2d 442, 453 (7th Cir. 1975); *Hanley v. Mitchell,* 460 F.2d 640, 648 (2d Cir.), *cert. denied,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972), or whether it acted on the basis of scant consideration. See *Hempstead Bank v. Smith,* 540 F.2d 57, 60 (2d Cir. 1976); *Chelsea Neighborhood Associations v. United States Postal Service,* 516 F.2d 378, 387 n. 23 (2d Cir. 1975).[18]

For their part, plaintiffs largely ignored, both at trial and in the post-trial briefs, the question whether the steps taken by HEW conformed to the requirements of the statute and the regulations. Instead, the merits of the State plan became the focus, with HEW's action a shell under which an attack on the merits could be made. Thus, the plaintiffs argued and attempted to prove that HEW was "wrong" in approving the plan because the plan was inadequate. From there, the adequacy of the plan was put to test. Whether the agency was right or wrong is not the object of review.[19] The matter for determination is rather whether, in reaching its expert conclusion, HEW followed a rational path, one marked by consideration of all relevant factors and free from clear errors of judgment.

### The Administrative Record

The first step in determining whether the Secretary's action was arbitrary and capricious is to define the data upon which he acted. Judicial "review is to be based on the full administrative record that was before the Secretary at the time he made his decision," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825 (footnote omitted), and not on the basis of ". . . some new record made initially in the reviewing court." *Camp v. Pitts, supra,* 411 U.S. at 142, 93 S.Ct. at 1244.[20]

**17.** The other potential standards of review, 5 U.S.C. § 706(2)(B), (C), (D), (E), and (F) either do not apply or reach the same result. Subsections (E) and (F) are inapplicable, the first because the action challenged here was neither rulemaking nor adjudication; the second because *de novo* review is indicated only when the judicial proceeding is one to enforce an administrative action or when there have been inadequate fact finding procedures in an adjudicatory proceeding. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Subsection (B) is no longer available since the plaintiffs did not press their constitutional claims at trial. To the extent that the charge of failure to observe the relevant criteria may be fitted to the language of subsections (C) or (D), our findings of fact would nevertheless be the same, as would be the conclusions of law.

**18.** The government urges that in conducting its inquiry, the court should uphold HEW's approval unless the agency had a "sufficient basis" for rejecting the State's plan. See *Massachusetts General Hospital v. Weiner,* 569 F.2d 1156, 1160 (1st Cir. 1978). Our findings make it unnecessary to decide whether state Medicaid plans submitted for HEW approval enjoy such a presumption of approvability.

**19.** Cf. *United States v. Nova Scotia Food Products Corp., supra,* 568 F.2d at 251 (2d Cir. 1977), "[A] reviewing court will not match submission against counter-submission to decide whether the agency was correct in its conclusion on . . . matters [within the agency's area of technical expertise]."

**20.** *Accord, United States v. Nova Scotia Food Products Corp., supra,* 568 F.2d at 249; *County of Suffolk v. Secretary of Interior, supra,* 562 F.2d at 1384; *National Nutritional Foods Association v. Weinberger,* 557 F.2d 325, 331 (2d

The parties have hotly disputed what constitutes the administrative record in this case. To resolve the dispute, we have been guided by the considerations which follow.

The prohibition against measuring agency action according to facts adduced for the first time on review derives from the doctrine of separation of powers:

"If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Securities & Exchange Commission v. Chenery Corporation,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).

"an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *Id.,* 318 U.S. at 95, 63 S.Ct. at 462.

█ The obvious and "important corollary" to the *Chenery* rule is that the "basis [of an administrative action] must be set forth with such clarity as to be understandable." *Securities & Exchange Commission v. Chenery Corporation,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). However, although the *Chenery* cases and the cases following them confine judicial review to the contemporaneous record, they give no indication how that record is to be discovered if it was not contemporaneously set forth clearly . . . or at all, for that matter. Where, as here, the agency's

action consists of non-formal decision making and there is no requirement that the Secretary compile a contemporaneous record, what the factual basis for his decision was is itself a question of fact, which is resolved like any other such question.[21]

The plaintiffs have consistently argued that that question of fact has already been resolved by HEW's submission of an "administrative record" and documents denominated "findings and reasons," Exhibits PX–1, PX–16—all of which were both compiled and presented well after the Secretary's approval in August, 1976.

We believe that in a case like this, where the "contemporaneous" factual record came into existence only after the challenged decision, the court's obligation to conduct a "thorough, probing, in-depth" inquiry, *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 415, 91 S.Ct. 814, requires it independently to determine what facts were before the agency at the time it acted. The conduct of such an inquiry is best calculated to determine the facts upon which the administrator actually relied and in no way compromises the separation of powers.

█ Moreover, even if the dimensions of the administrative record did not pose an issue of fact in this case—that is, even if there were no dispute about the basis of the Secretary's approval—supplementary testimony would be required. This is so because here, as in every other case involving examination of an agency decision, the basis of the decision is not merely factual, but also involves theoretical considerations. That is, the court must not only determine the facts upon which the agency made its decision but also how it construed these facts.[22]

---

Cir. 1977) ("*National Nutritional II* "); *National Nutritional Foods Association v. Weinberger,* 512 F.2d 688, 701 (2d Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975) ("*National Nutritional I* ").

**21.** In cases involving rulemaking and adjudication, the record is defined as a matter of law. See 5 U.S.C. §§ 553(c), 554(c)(2).

**22.** In cases involving "on the record" rulemaking and adjudication, this question is normally resolved by referring to contemporaneous documentation. See 5 U.S.C. § 557(c)(A). In cases involving non-formal decision making, although the agency is under no obligation to record its rationale, if it does so contemporaneously, the contemporaneous record may be dispositive of the question. See *Camp v. Pitts, supra,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106.

This, too, is a question of fact, and is resolved on the basis of written or oral testimony of agency officials:

> ". . . since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence, it may be necessary for the District Court to require some explanation in order to determine if the . . . Secretary's action was justifiable under the applicable standard." *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 420, 91 S.Ct. at 825; *accord, Camp v. Pitts, supra,* 411 U.S. at 142–43, 93 S.Ct. 1241; *County of Suffolk v. Secretary of Interior, supra,* 562 F.2d at 1384 ("Although review of deliberative memoranda reflecting an agency's mental process . . . is usually frowned upon, . . . in the absence of formal administrative findings they may be considered by the court to determine the reasons for the decision-maker's choice." (citations omitted); *National Nutritional II, supra,* 557 F.2d at 331–32.

These considerations lead us to judge HEW's approval in the light of the thought processes which, although in some instances first asserted at trial, we credit as having been employed contemporaneously by the agency in reaching its decision.

## FINDINGS

### Satisfying the Reasonable Cost Criterion—Impact

At trial, the hospitals attempted to establish that the State's formula, referred to above, which generated the impact figures was wrong and that therefore, HEW's conclusion that the plan provided reimbursement of reasonable costs—a conclusion that rested principally on HEW's review of the impact tables—was arbitrary and capricious.[23] The hospitals offered a formula which shows the impact of the lowered ceilings to be substantially greater than the

one upon which HEW acted. Resolution of the dispute requires that both formulas be described in greater detail.

As indicated above, the State formula expressed impact both as an absolute disallowance (the Medicaid Disallowance) and as a percentage representing the Medicaid Disallowance divided by the total base year inpatient cost. The Medicaid Disallowance, the amount by which a hospital's Medicaid costs exceeds the ceiling,[24] is derived by multiplying a hospital's total Medicaid days by its per diem Medicaid Disallowance (the last figure is the amount by which a hospital's per patient, per diem base year cost exceeds the group average). In short, the Medicaid Disallowance is the projected "shortfall" of the prospective payments and the State's impact formula compares that shortfall to the hospital's total inpatient costs.

HEW viewed the impact data in a variety of perspectives, taking into account that hospitals could respond to a projected shortfall in a number of ways. As Budoff (and others) testified at trial, a hospital faced with a Medicaid Disallowance could: (1) retain its cost structure and attempt to recover the disallowance on appeal (Tr. 302, 2821), (2) retain its cost structure and suffer the disallowed amount as a deficit (Tr. 302–03, 899; see also, *id.* at 3295–96, 3313, 3323–25), or (3) reduce its total inpatient cost by the amount of the Medicaid Disallowance and thereby balance its books in the rate year (Tr. 302, 899, 906, 918)

Bearing these considerations in mind, HEW concluded that notwithstanding the diminution of the prospective payment rate (which, according to the impact formula HEW accepted, for more than 90% of the hospitals, would result in disallowances of between 0 and 2% of total actual costs), the plan guaranteed reasonable reimbursement:

> "we went to the impact statement and determined that . . . 92 percent of

---

**23.** The hospitals also argued that it was arbitrary and capricious for HEW to base its conclusions as to reasonable cost reimbursement on the presumption of inefficiency, because that presumption was not stated in the administrative record and, in any event, was baseless.

**24.** The Medicaid Disallowance includes the interns'/residents' disallowance, but for the purpose of argument as to what impact formula was correct, the interns'/residents' disallowance was ignored by all parties.

[the] hospitals were going to have costs disallowed of between 0 and 2 percent of their total inpatient costs . . . . [I]f they can justify . . . [the disallowed] costs and can satisfy an appeal on those costs, they will get those costs . . [On the other hand, the disallowance] is not money which is being taken away from . . . [a hospital] at . . . [the time the new formula is announced]. [The new rate] is a notification that in the coming year . . . [the hospital is] going to receive X amount of money. If [it] can't justify [its] costs, [it] has the coming year to reduce [its] costs by that percentage and if [it is] successful in doing that, [it] can be whole at the end of the year, [its] income will match [its] expenses.

"An impact of between 0 and 2 percent on a cost that couldn't be justified seemed to us to be a reasonable thing to do." (Tr. 302–03)

In their attack on HEW's conclusion with regard to reasonable costs, the hospitals focused on the impact analysis, and, in particular, on rebutting Budoff's remarks that a hospital would be made whole if it cut its inpatient costs by the amount of the Medicaid Disallowance.

Crucial to Budoff's conclusion as to the amount a hospital would have to save to balance its books was the expectation that whatever reductions the hospitals achieved as to Medicaid patients in the rate year, *non*-Medicaid patients would continue to pay at the same level as before. (Tr. 905–06) It was this expectation that the hospitals, through their expert, Dr. Norman Hirsch, criticized:

". . . in the real world, a hospital gets reimbursed from not only Medicaid,

but from other third party payers; and other third party payers generally pay based on actual costs incurred . . .

"Therefore, if a hospital does reduce the costs as . . . testified to by Mr. Budoff, the cost of all the patients is reduced and therefore, the hospital receive[s] less reimbursement from the other third parties than it had originally intended to do." (Tr. 3109)[25]

According to Hirsch, a reduction in cost equal to the Medicaid Disallowance would not balance the books because, as Budoff conceded (Tr. 903, 2420), a reduction in hospital costs must be distributed over the entire patient population, not just the Medicaid segment:[26] therefore, a reduction equal to the Medicaid Disallowance would not bring the Medicaid patient per diem cost down to the ceiling level. Consequently, the Medicaid portion of the books would show a deficit, and that deficit would not be compensated for by other third party payers, since, according to Hirsch, they would pay no more than the rate to which the per diem cost had been reduced.

In plaintiffs' view, the only way a hospital could balance its books would be to eliminate the deficit in the Medicaid portion of the budget. But this elimination in turn would require a hospital to reduce its *total* costs sufficiently so that when the reduction was averaged over the entire patient population, the per diem cost *for all patients* would drop to the level of the Medicaid ceiling. Such a reduction the plaintiffs define as the "total disallowance," the product of the per diem Medicaid Disallowance and the *total number of patient days* (rather than the number of Medicaid patient days which is the multiplier used in the

25. As an example of the claimed reverberating effect that any Medicaid reductions would have, the hospitals testified to "Blue Cross coupling," a phenomenon which they asserted would itself increase the impact figures by a factor of 2.5% (Tr. 3112):

"At least in the northeastern part of the United States, almost all the Blue Cross plans have some form of reimbursement which is closely related to cost; be it on a prospective or retrospective basis." (Tr. 3113)

". . . for the patients that are covered by Blue Cross . . . their reimbursement is going to be reduced if indeed the same formula were applied as applied to Medicaid." (Tr. 3111).

26. Although Budoff testified that cost cutting had to be "across the board," because hospitals could not restrict patient cost to the indistinguishable Medicaid segment, an HEW expert testified that such a restriction was possible (*infra*, at n. 29).

State's impact formula). In other words, the formula relied on by HEW was asserted to be incorrect by a factor equal

Total patient days

to

Medicaid patient days

■ We find that HEW rationally reviewed the reasonable cost criterion and that its use of the State's impact formula was not "arbitrary or capricious," nor did it amount to a "clear error of judgment." First, the hospitals failed to establish that Medicaid cuts would be imitated by other third party payers.[27] Blue Cross was the only example of alleged coupling that was offered, and although there was no dispute that Blue Cross' reimbursement rates might be affected by the Medicaid rates (Tr. 696–99, 2623, 3110–11, 3301–02), the hospitals presented no evidence of the *details* of the Blue Cross plan, and there was no proof that Blue Cross' ceilings were set at the same level as Medicaid's, so there was no proof as to the magnitude of the Blue Cross disallowance, if any (see Tr. 2836, 3365). On the other hand, Budoff testified that certain reimbursements prohibited under Medicaid would be permitted by Blue Cross (TR. 699). Furthermore, he testified that Blue Cross was believed to use a different statistical method for computing its group averages (TR. 2674–75). In sum, there was no evidence as to the precise relation between Blue Cross and Medicaid nor was there any evidence to support Hirsch's proposition that the inclusion of the alleged coupling effect would on the whole raise the impact by a factor of 2.5. Having said

this we consequently find that when HEW considered impact-as-deficit, it reasonably measured the deficit to be the Medicaid Disallowance, and not any additional disallowances resulting from coupling.

Second, even if the hospitals had made an adequate showing on the question of coupling, they failed to establish the correctness of their view as to what would be required of a hospital in order for it to balance its books; indeed, there was substantial testimony from the other side rebutting the hospitals' theory that the only way to balance the budget would be to reduce costs by the total disallowance. What emerged at trial is that the real world, which HEW was charged with having ignored, is substantially more complicated than either Budoff conceived or Hirsch testified. For example, Hirsch conceded that notwithstanding the practice of other third party payers, some portion of the hospitals' population would continue to pay at a rate in excess of actual cost. Taking this into account, Hirsch's tables showed that if a hospital attempted to balance its books as Budoff had suggested, by reducing total costs by the Medicaid Disallowance, although the books would not balance, the imbalance amounted to 0.7% of the hospitals' total inpatient costs.[28]

In further rebuttal of plaintiffs' contention, HEW's expert, Fred Hellinger, testified—and we credit his testimony—that a hospital notified of a decrease in its Medicaid reimbursement could manipulate its costs in several ways to compensate for the reduced revenue, all without making the drastic cut described by Hirsch.[29]

---

**27.** Even Hirsch's testimony as to coupling was phrased in a tentative mode (see text at n. 25).

**28.** See PX–29, line B, where a hospital with $10,000,000. total inpatient cost shows a $70,-000. imbalance. Note that even assuming all non-Medicaid patients paid at a strict cost rate, Hirsch's tables showed that the Budoff "balance" formula was incorrect by a factor of only .8%. PX–28, line C ($80,000. deficit in a $10,000,000. budget).

**29.** A hospital can increase charges for those patients whose reimbursement is on a charge, as opposed to cost, basis (e. g., self-payers). In some instances, this increase may be accom-

plished by identifying services that are used more often by one group of patients than by another:

". . . it is possible for hospitals to increase the charges for services used most intensively by Medicare patients, hence increase the ratio of Medicare charges to total charges within a given department, and, hence, increase the reimbursement.

"In fact, we have done studies which indicate that hospitals do exactly that." (Tr. 3327; see also, *id.* at 3293, 3321).

Moreover, use of "disallowances"—particularly total disallowances—is a completely inappropriate way to measure impact in light of the existence of an appeals system. As discussed above, HEW correctly perceived that one, if not the most probable, response of a hospital adversely affected by the lowered ceiling was to prosecute an appeal. The stake on such an appeal is the Medicaid Disallowance—the total disallowance is irrelevant—and HEW reasonably concluded that the availability of appeal insures that whatever the shortfall of prospective payments, a hospital will ultimately be reimbursed its full reasonable costs.

Finally, obliging HEW to use the plaintiffs' proposed theory of "impact accounting," which measures the effect of changes in Medicaid reimbursement rates on the rates of other hospital payers, may well be inconsistent with Congressional intent. The hospitals appear to argue that in considering any reduction in Medicaid payments, the State (and HEW) are required to anticipate the secondary effect that such cuts might have on rates for similar services for non-Medicaid patients. When HANYS presented this argument to Budoff (prior to HEW's approval), he responded bluntly that HEW was

"aware of the coupling but did not take that into consideration in . . . approving a Medicaid reimbursement methodology because we were concerned with paying reasonable rates for Medicaid patients and what Blue Cross might or might not do was not our consideration." (Tr. 2840–41)

Hellinger also testified that Medicaid cost can be decreased independently of other patients costs, through the manipulation of the lengths of stay of Medicaid patients. (Tr. 3293–96)

30. In light of this and the consequent ruling upholding HEW's conclusion as to the reasonableness of the rates, it is unnecessary to decide whether HEW ought to have rejected the State's grouping criteria, or the statistical methods it used in computing the group average. Grouping was the means of setting the ceiling rate. Once HEW determined that the ceilings (together with appeals), provided reasonable reimbursement, it was unnecessary to decide whether the groups were properly constructed and the average correctly computed.

We believe that Budoff's view properly perceived the limits of the State's and HEW's responsibility. Carried to its logical conclusion, the implication of the hospitals' impact theory would result in the proposition that *no* Medicaid cut, even one which disallowed unreasonable cost, may be made unless the hospitals are "held harmless" against any secondary effect on non-Medicaid costs and revenues. It is seriously to be doubted that Congress intended the State or HEW to be responsible, directly or indirectly, for the payment schedules applicable to services rendered to non-Medicaid patients. Such an intent would be inconsistent with the State's power to determine what constitutes reasonable Medicaid costs and to reimburse accordingly. It would also saddle both the State and HEW with an impossible task. The trial made evident that a hospital may avail itself of a number of strategies to cope with budget cuts, so that the *effect* of a Medicaid cut, as opposed to its *amount*, is something that can be measured only after a hospital chooses its responsive strategy. Neither the State nor HEW may be charged with anticipating the full range of a hospital's reactions to a reduction in Medicaid revenues.

In sum, we find that HEW's reliance on the State's impact tables was not a clear error of judgment.[30] Having said this, in light of what the impact tables showed—a negligible, if any, disallowance of actual costs, which might nevertheless be recovered on appeal—HEW's conclusion that the plan would provide payment on a reasona-

It should be noted, however, that HEW did explicitly consider whether the criteria for grouping hospitals were sufficiently refined in light of the lowered ceilings and it decided they were. (Tr. 119–20, 144–45, 800, 1418; see also id. at 290–91, 1416, 1430–33, 2354–55) As for the statistical methods used by the State, HEW offered evidence that they were sound (see Tr. 210–11, 306, 1403–08, 2075–76) while the hospitals submitted nothing to contest this conclusion, but merely offered testimony that the State's methods differed from Blue Cross.

ble cost basis rested on rational grounds; it was not reached arbitrarily and capriciously.[31]

### HEW's Failure to Consider the HHC Data

■ HHC is the State's primary Medicaid provider, accounting on .its own for more than 40% of the Medicaid inpatient days of care rendered by all hospitals in the State. (Tr. 3159; PX–33) In reaching its conclusions as to what the impact of the 1976 amendments would be on the hospitals of New York State, HEW acted on figures which did not include data relating to HHC. (Tr. 502–4, 868–9, 892–99) HEW's witnesses explained this figure by stating that no reliable data as to HHC was available and that, in any event, the impact of the amendments on HHC and other hospitals could be determined by extrapolation of the figures which were available.

HHC challenges HEW's explanation, asserting that reliable HHC information was available before HEW made its decision and that the extrapolated data was inadequate. HHC claims that if HEW had taken into consideration HHC's figures it would have concluded that the statewide impact of the amendments was $61,000,000. rather than $25,000,000., the figure on which HEW relied.

Whatever first blush appeal HHC's argument has, on considered judgment it is not persuasive. While it is undisputed that the percentage of Medicaid patients treated by HHC hospitals was substantially higher than the percentage of Medicaid patients treated by other hospitals, the plaintiffs did not demonstrate that the proportion of a hospital's patients receiving Medicaid assistance necessarily influences its costs. What the statute and regulations call for, and

what the hospitals are entitled to receive is the reimbursement of their "reasonable costs." In sum, it cannot be said that because HHC's percentage of Medicaid patients is high, its reasonable costs for treating them will necessarily vary from that of other hospitals and therefore warrant reimbursement at a different level. Moreover, Budoff testified that because of HEW's concern that the data submitted to it by the State did not contain information as to the impact upon HHC (Tr. 870–72), it was determined, reasonably, we believe, that the HHC hospitals' costs be "leaned against;" that is, be made subject to the appropriate group average after the calculations. (Tr. 872–73, PX–1 at 17)

Finally, it must be remembered that HEW knew HHC could, of course, appeal if the actual impact of the amendments, in fact, resulted in HHC's being reimbursed less than its reasonable costs.

In the circumstances, we do not find HEW's failure to have considered data relating specifically to HHC to have rendered its determination arbitrary or capricious.

### Satisfying the Reasonable Cost Criterion—Appeals .

■ HEW's conclusion that the plan provided reasonable reimbursement was based, in important part, on its view that any deficiencies in the prospective phase of reimbursement could be cured on appeal. As HEW saw it, the appeal process would allow hospitals to recoup any justified costs that had been disallowed as being in excess of the group average, and HEW perceived the process to be an essential element of the plan (Tr. 292, 303, 1002–03, 1347–48):

". . . [W]e approved that ceiling reduction only after we had received from the state adequate representation and

---

**31.** As an additional ground supporting the conclusion, HEW's principal decision makers testified to their belief, based on long experience with the hospital industry, that the industry was inefficient. While Budoff's and Coughlin's testimony credibly describes some of the thoughts they may have had when they considered the cost data, the evidence conclusively establishes that with regard to the reasonable

reimbursement criterion, HEW's conclusion rested primarily, if not entirely, on the small size of the impact relative to total actual cost and the availability of appeal. Because we find the conclusion justifiable on these grounds alone, there is no need to decide whether the hospital industry may be accurately described as inefficient.

documentation that an appeals process would exist that would give relief to those hospitals that had legitimate costs above the ceiling . . . [The new plan] would not have been approved without an adequate appeals process." (Tr. 165; see also, *id.* at 549–50, 1017)

The hospitals contend that HEW approved the 1976 amendments without receiving any meaningful assurance that the vital appeals element would work. In particular, they complain that: (1) there was no written description of the appeals mechanism, so that hospitals had no idea how to file or prosecute an appeal, (2) the grounds upon which an appeal could be taken were unknown, (3) there was no guarantee that hospitals would have sufficient data with which to support an appeal, (4) there was no assurance that procedural due process standards would be met, (5) HEW failed to obtain any written promise that sufficient staff would be made available to process appeals timely, and (6) that in view of all the above mentioned points, the appeals system, which the hospitals contend comprises the core of the 1976 plan, lacked methods and standards, in violation of 42 U.S.C. § 1396a(a)(13)(D).[32]

*Lack of Written Description*

Prior to HEW's approval of the 1976 amendments, HANYS complained to the agency that the State had not provided the hospitals with a written explanation of the appeals process (PX–1 at 395, 480; Tr. 2059–60). HEW conveyed these complaints to the State during negotiations conducted in the first two weeks of August, 1976 (Tr.

2063–78, 2491–95). The State conceded that no explanation had been written and circulated; it explained that its failure to publish an appeals guide was motivated by its concern that publication would lead to a rash of appeals (Tr. 577, 1336, 2454). HEW insisted that the State distribute to the hospitals "a written appeals procedure so that there would be no question of the mechanics of actually filing an appeal." (Tr. 2078; see also, *id.* at 329, 2454–55, 2716). As a result of this insistence, the State committed itself to writing and circulating an appeals guide (Tr. 2455). Although the guide itself was not contained in the plan when and as approved (Tr. 1320), the plan did contain a comprehensive outline of the guide (PX–1 at 51–2),[33] and the State gave HEW oral assurances that it would ultimately produce and circulate a detailed explanation of the procedure. (Tr. 1318, 1336). These assurances were confirmed in a letter from the State, which accompanied the comprehensive outline:

"As indicated at our August 12th meeting, this [written appeals] process will be distributed to all hospitals statewide with sufficient detail to make it clear and readily accessible to all interested parties. . . ." (PX–1 at 50) (Letter of J. Raymond Diehl, Jr., Acting Deputy Commissioner, Division of Medical Assistance)

On the basis of the oral assurances and the written confirmation HEW satisfied itself that the State would publish and send a written explanation of the appeals system (Tr. 1335–36; see also, *id.* at 1312–18, 1323–25, 2716). As Acting Deputy Regional Commissioner Dennis Coughlin testified:

---

**32.** The hospitals also contend that HEW's approval of the appeals system was faulty because the system provided that the State budget director could veto awards won on appeal. We earlier held, *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 875–76, and now reiterate, that if the State budget director exercises his veto power illegally (that is to say, in contravention of the State plan or the Medicaid statute and regulations), that exercise would raise a compliance issue. The mere fact that the veto power existed does not invalidate HEW's approval.

**33.** There is some question whether PX–1 at 51–52 is technically part of the plan, although,

as the court observed, (Tr. 1300), the dispute is largely semantic (see generally, Tr. 1297–1310). The outline was not submitted under the proper cover, an "OPC 11" form, and Coughlin testified on deposition that it was not officially part of the plan, (Tr. 1298, 2884–90) (he changed his testimony at trial; Tr. 1300–01, 1309–10). Whether or not technically part of the plan, the outline was treated as such by both HEW (Tr. 1301, 1304) and the State, as is apparent from the Diehl letter quoted above, which, in pertinent part, reads ". . . the enclosed should make it possible for you to approve [the amendments] effective this date." (PX–1 at 50)

". . . pages 51 and 52 [of the administrative record, PX–1] . . .—that document from my perspective represented an outline and a commitment on [the State's] part that they would publish procedures and disseminate these procedures so that all hospitals would be aware of what steps had to be undertaken and followed in filing an appeal. . . ." (Tr. 1311; see also, *id.,* at 579, 1322)

The hospitals do not contend that HEW failed to explore the "appeals guide" problem with the State. (Certainly, the uncontradicted testimony adduced at trial established that HEW not only reviewed the problem but was active in, and primarily responsible for, getting the State to correct the problem.) However, the hospitals argue vigorously that HEW impermissibly relied on the State's oral assurances with regard to the promised guide, and that there was accordingly no reliable assurance that the State would fulfill its obligations.

First, as we held in the earlier opinion, neither statute nor regulation prohibits HEW from acting on the basis or oral promises. *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 872. In any event, the State's oral assurances were confirmed in writing by the Diehl letter. However, neither oral nor written assurances provide an absolute guarantee of future performance; nor as we view it, is HEW obligated in reviewing and approving proposed plans, to obtain such guarantees. In the nature of things, there is always a possibility that a State may not comply with its own obligations under a plan. The solution is not to defer approval or insist that all promises be written but, rather in case of breach, to enforce the promises, oral or written, that the State makes. Budoff testified, and we have no reason to discredit his testimony, that had the State failed to publish the guidelines as promised, HEW would have commenced a compliance proceeding. (Tr. 751, 1017–18).

Moreover, as Budoff testified, HEW had no reason to distrust the State's oral assurances:

". . . the State of New York and the federal government had had a long-standing relationship and . . . oral representations were continually being made back and forth.

"There was the understanding or the fact that we would continue to have relationships with the state and to the extent that they had up to that point not reneged on any prior oral representations, there was no reason to conclude that they were going to renege on oral representations being made at that point." (Tr. 1034–35)

We believe that where, as here, there was no history which would cause HEW not to rely on the State of New York, it was entitled to accept the State's word, especially in matters of such import and where a mechanism for forcing compliance existed if the word were breached. (Tr. 1208–09)

*Grounds for Appeal*

Plaintiffs contend that the appeals section of the approved plan does not adequately specify the grounds upon which appeals from the ceiling rates may be taken. Furthermore, it is argued that the provision does not indicate what showing an appellant must make to prevail on appeal. Aside from the fact that this argument speaks more to the merits of the plan than to the adequacy of HEW's review, it is inaccurate. The appeal system lists specific grounds for an appeal and also includes a catch-all provision that permits an appeal to be taken whenever a hospital can identify a "pertinent factor" that causes costs in excess of the ceiling:

"86.17 Revisions in Certified Rates. (a) The State Commissioner of Health may consider only those applications for prospective revisions of certified rates which are based on

* * * * * *

"(7) requests for relief from the ceiling provisions of section 86.14 of this part. For such relief, a medical facility must demonstrate that its range of approved services, patient mix, lengths of appropri-

ate stays *or other pertinent factors* * are direct causes for all or part of the costs in excess of the routine or ancillary ceilings. Such relief shall not result in a rate which exceeds that based on maximum reimbursable State standards, unless a waiver of such standards is granted by the commissioner. *If relief is granted, the resulting revised rate shall become effective as of the first day of the rate period.* (PX–1 at 349–50) (emphasis in original)

We find that the above-quoted provision is meaningful and that HEW's endorsement of it was rational and certainly not a clear error of judgment.

Moreover, it is fair to say that the language amounts to the very sort of provision that HANYS lobbied for prior to HEW's approval, as may be seen from its written submission to the agency:

"Appealable items ought to include . . ceilings . . ." (PX–1 at 480)

"Inasmuch as the New York State prospective rate setting system makes no provision for end-of-the-year adjustments, it is important that [the appeals provision] be as flexible as possible and recognize unforeseen and special circumstances." (*Id.* at 391–92; see also, *id.* at 394)

It is evident from the correspondence under whose cover the amendments to the appeals provisions were submitted (PX–1 at 342, 348), as well as from the annotations to the amendments themselves (*id.* at 347, 350), that HEW was largely responsible for persuading the State to adopt HANYS' suggestions. HEW cannot be criticized for having carried out HANYS' wishes.

### Unavailability of Data

The availability of an appellate forum was an empty promise, charge the hospitals, unless data sufficient to make an argument were available to the aggrieved providers. HEW is alleged to have been derelict in

taking the State's word that it would provide the hospitals with the information needed to prosecute appeals. Aside from the fact that the trial record does not support plaintiffs' claim that the State promised to provide all necessary data, we find that collection of data necessary for appeal is reasonably the hospitals', not the state's or HEW's, responsibility.

First, during its negotiations with HEW, the State did represent that the hospitals would be provided sufficient data to prosecute an appeal, but not that the *State* would be the sole source of that data. To the contrary, the State indicated that it would provide whatever information it had (Tr. 570, 1342, 1345) and that it anticipated that additional data would be available through professional hospital associations and cooperatives. (Tr. 620–22) What the State did represent was that by using all sources of information, available from *both* the State and professional organizations, the hospitals would have the information necessary to take an appeal:

"In discussing how the hospital[s] could present their appeal, the State represented that they would make available to the hospitals any data that they would have that would be pertinent and also that the Hospital Association themselves had a fairly large network of sharing information and that [a] hospital would be able to make its appeal from the data that was out there and available." (Tr. 2108–09; see also, *id.* at 620–22, 1471–74, 2719)

HEW relied on the State's oral assurance as to the general availability of data (Tr. 639–40); it conducted no independent investigation on this issue. (Tr. 638–39, 1349–50)

As indicated in our earlier discussion, reliance on these oral representations was reasonable (see *supra* at 933–934). Furthermore, there was no evidence at trial that the reliance was misplaced: the plaintiffs made no showing that the data was unavailable.[34] Moreover, the State, much

* (emphasis supplied)

34. George Meitch, who had 17 years experience with the New York State health program, and substantial experience with the appeals bureau (Tr. 1452–53), testified that he never heard of an appeal failing for lack of information (Tr. 1520).

less HEW, is not the guarantor of information. Like any other litigant, a hospital must assume the burden of making its case, and this means that it has the primary responsibility for collecting pertinent information[35] where there is no showing that the State is the sole repository of the necessary data.

### Procedural Due Process of Appeal System

At the administrative level, HANYS complained to HEW that the plan's appeals provision specifies ". . . no time limits, specific hearing procedures, or notice requirements," and urged that the provision be brought "into conformity with fundamental due process requirements." (PX–1 at 395–96)

The procedural due process aspects of the appeals system—the right to a hearing, the time within which an appeal could be taken and within which it had to be decided, the burden of proof and the standard of decision-making—were matters that Budoff and Coughlin did not consider. (Tr. 572–73, 608–10, 1224–26; see also, id. at 2222–23) Budoff relied exclusively on the advice of HEW's regional attorney that the appeals system conformed with due process. (Tr. 569, 580–81, 609)

Such dependence was not unreasonable in the circumstances. The question was a legal one, properly left to HEW's regional attorney. Moreover, HEW cannot be charged with the responsibility of guaranteeing the plan's conformity with the Constitution. Whether a procedure offends due process is often a complicated question, and, absent glaring defects—none of which have been established in the present case—the question does not even arise until, in the course of applying the system, particular defects are discovered or complained of.

Even then, the remedies are negotiation between concerned parties (in this case, the hospitals and the State) or, if that fails, recourse to HEW or the courts.

### Staffing

When HEW discussed the proposed appeals system with the State, the agency was aware that there was already a backlog of appeals. (Tr. 555–58, 564, 2074–75) Mindful that increased appeals could be anticipated in light of the lowered ceilings, HEW discussed whether the State would be able to handle the increased load. These discussions were not detailed; HEW did not explore how much additional staff would be required, or how much time would be involved in the resolution of any given appeal. (Tr. 1336–37, see also, id. at 750, 2717). Instead, the agency relied on the State's verbal assurance that it would hire whatever staff and take whatever steps were necessary to process the appeals on a reasonably prompt basis. (Tr. 565, 567–68, 577–78, 750–51, 1335–36, 2075) As Budoff testified:

". . . we got assurances and representations from the State of New York that should every one of the hospitals appeal, the [S]tate was prepared to put on whatever staff and do whatever was necessary to process those appeals in a reasonable period of time." (Tr. 303; see also, id. at 2078)

Based on these assurances, and also upon HEW's recognition that despite the backlog, the State had been processing appeals at a satisfactory rate in the past (Tr. 571–72), HEW felt that the State would process appeals adequately.

As in other instances, the hospitals criticize HEW's reliance on the State's oral assurances, but as earlier discussed, such re-

---

**35.** This is a logical requirement, since information relevant to appeals originates from the hospitals themselves. For example, the hospitals argue that comparative patient-mix data was crucial for appeals and the State ought to have provided it. However, Ginsburg testified that "every hospital in New York has information in its medical records as far as what the diagnosis of each patient is . . ." (Tr. 3569–70). Obviously, the most efficient way to get that information is to seek it directly from the members of the peer group. The hospitals recognized this, but, recognizing that collection would be time consuming, wanted the State to assume the burden. (Tr. 1342–45)

liance was reasonable, and, therefore, HEW's conclusion that the appeals system would be adequately staffed was not arbitrary or a clear error of judgment.

*Methods and Standards*

The hospitals argue that the appeals process amounted, in fact, to the plan (i. e., the tail that wagged the dog) and because that process lacked "methods and standards," the plan itself lacked "methods and standards." The hospitals established neither premise of this argument.

First, the appeals process was not *the* plan, but part of it. (Tr. 1002–03) Plaintiffs argue that 61% of the hospitals were expected to appeal. This percentage indicates nothing. As we said in an earlier opinion, the importance of the appeals system is not to be measured by the number of appeals expected, but the stakes on appeal. *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 874. HEW was aware of the 61% figure, but it concluded that because of what it considered to be the minimal impact of the proposed rate changes, almost all of the appeals would involve small stakes. It was in this context that HEW concluded that the appeals process was adequate, and we find that that conclusion was not reached arbitrarily or capriciously, nor was it a clear error of judgment.

Yet even if the appeals procedure could fairly be designated as "the plan," HEW reasonably concluded that it contained "methods and standards." Section 86.-17(a)(7) lists the bases on which appeals may be brought and this sufficiently notifies hospitals of what is required to recoup disallowed amounts. To the extent that the provision is general, it reflects a need for a system that can accommodate extraordinary circumstances. That there is no explicit mention of burden of proof, nor guidelines for rendering decisions is not fatal. As for the mechanics of the process—how long appeals would take, how many staff members there would be—HEW reasonably relied on the State's assurance that these would be properly taken care of.

Finally, it is important to note that the process provided that an unfavorable decision on appeal could be further appealed to the courts of New York State pursuant to Article 78 of the Civil Practice Law and Rules. That provision assured all concerned that any dispute as to whether a hospital would be reimbursed its reasonable costs would be determined objectively and in accordance with law; and knowledge of the existence of this provision strengthened the reasonableness of HEW's approval of the appeal system.

\* \* \* \* \* \*

In sum, the plan that HEW approved did provide "for payment of the reasonable cost . . . in accordance with methods and standards . . ." (42 U.S.C. § 1396a(a)(13)(D)). The approved plan was partly prospective (reimbursement on the basis of the group average) and partly retrospective (appeals). The prospective portion clearly contained well defined methods and standards for computing reimbursement (grouping, averaging, imposing ceilings), as did the appeals part. Though a hospital may not have known in advance precisely how much money it would receive, the statute and regulations do not require that. They command that methods and standards for computing the ultimate amount be worked out in advance. The State plan accomplished this and HEW's conclusion that it did so was not arbitrary or capricious.

*Other Criteria*

*Incentives for Efficiency and Economy*

It has never seriously been contended that HEW failed to pay adequate attention to whether the State plan contained "incentives for efficiency and economy." 45 C.F.R. § 250.30(a)(2)(ii)(a). Indeed, on the earlier motion for summary judgment, the hospitals argued that this criterion received too much emphasis *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 873 and at trial they offered no rebuttal to the validity of HEW's analysis—described below—with regard to this criterion.

■ What emerged at trial is that HEW concluded that the basic structure and operation of the plan as a whole provided incentives to operate efficiently. As Budoff testified without challenge, a prospective reimbursement system, which announces paid rates in advance of the reimbursement year, encourages hospitals to bring their costs into conformity with the rates.

". . . [T]he methodology itself is a prospective reimbursement methodology and the nature of a prospective reimbursement methodology is to indicate to [a hospital] what its reimbursement will be for the coming year.

"A prudent operator . . . knows how much money he is going to get for the coming year. [T]o the extent that this amount of money has . . . ceilings and limitations . . . [it] require[s] him, in order to have his income meet his expenditures, to realize certain efficiencies and economies. So it is the nature of the prospective system itself that induces efficiencies and economies." (Tr. 115–116; see also, *id.* at 117, 2260–61)

This analysis is palpably rational, not arbitrary or capricious. It is interesting to note that Budoff's testimony is consistent with what the Washington office of HEW later (post-trial) announced to be its position on the question of efficiency and economy:

"Incentives For Efficiency
And Economy

Comment. How does a State adopt standards and principles which provide incentives for efficiency and economy? This provision is so vague that it appears unenforceable.

Response. There are various approaches to meeting this criterion. One approach, for example, would be to establish prospective payment rates: another approach would be to establish rates based on comparisons with peer groups.

In keeping with the flexibility intended for development of alternative plans, we do not mandate specific methods." 43 Fed.Reg. 8803 (March 3, 1978) [36]

*Assurance of Adequate Participation and High Quality Care*

■ As discussed earlier, HEW's conclusion with respect to the participation/quality criterion was based on its impact analysis. Starting with the premise, which was not challenged, that participation of hospitals under the old plan had been 100% (Tr. 132) and that the quality of care was excellent (Tr. 827), HEW decided that the minimal impact of the lowered ceilings would neither cause hospitals to withdraw from the program, nor impair the quality of their medical services. (Tr. 133, 826–28, 1180, 2304, 2316–17). This conclusion proceeds along an obviously logical line of reasoning, and except to contest the validity of HEW's views on impact, the hospitals did not offer evidence disproving the rationality of HEW's analysis. Since we have found that HEW's measurement of impact was not arbitrary and capricious, it follows that HEW's conclusion with regard to the participation/quality factor was rational and not a clear error of judgment.

*Interns and Residents Disallowance*

■ The 1976 amendments to the State plan included a provision that:

"In computing allowable costs related to salaries and fringe benefits for interns and residents for purposes of reimbursement during the period January 1, 1976 through March 31, 1977, ten per cent of such costs will be eliminated from rate computations on the basis that this elimination represents the minimum amount properly chargeable to education activities not directly related to patient services." (Section 86.26)

---

36. The approved plan was also believed to encourage efficiency by comparing a hospital's costs to those of its peer group (Tr. 116, 2261; see also, *id.* at 762 -63, 765). The hospitals attacked this conception on the grounds that, as HEW itself conceded (Tr. 957, 3006–07), there is no absolute definition of efficiency. The argument fails, however, since HEW's view was that the nature of the plan permitted *relative* judgments as to efficiency. Such judgments may be made even in the absence of an absolute measure.

For 1975 and earlier years the State had reimbursed the hospitals 100% of the salaries and fringe benefits for interns and residents. The hospitals allege that there was no rational basis for the State's determination that the 10% elimination was "properly chargeable to education activities" and not "related to patient services." They argue that HEW's action in approving the amendment of Section 86.26 was arbitrary and capricious not only because the State's amendment was unsupported by reason or evidence but also because as to this issue, HEW abdicated its responsibility to review the plan, allowing the State carte blanche to decide for what portion of residents and interns salaries the State would reimburse the hospital.

Before August 20, 1976, the State proposed to HEW a regulation which would have permitted it to make an across-the-board disallowance of 10% of the costs of interns and residents in every hospital. In support of its application the State submitted documentation which purported to show that at least 10% of residents' and interns' hospital time was spent on educational rather than patient care activities. On August 20th, HEW Washington, in a memorandum to the Regional Commissioner of HEW in New York, rejected the application stating (PX–12, p. 2), "we are of the opinion that this documentation is inadequate to support a decision . . . ."

Having refused to approve the proposed amendment because it was not supported by sufficient evidence, it might have been suspected that this would have been the end of the matter, but it was not. The State continued to press the request on the theory that it was reasonable to assume that *some portion of residents' and interns' time was* clearly attributable to education and that under the statute and regulations, the State was not liable to reimburse the hospitals for that time, whatever it was. Accepting the assumption uncritically, HEW, which had refused to approve the State's application for disallowance of a specific percentage of resident-intern salary, nevertheless, approved the State's right to decline to reimburse whatever portion of those salaries the

State determined to be devoted to educational matters. To compound the irrationality of this behavior, HEW approved such a carte blanche regulation knowing in advance that the State would, in fact, implement such approval by actually enacting a 10% across-the-board disallowance: the very act which when specifically presented had been disapproved. Budoff testified as to this:

"Q In other words, you knew in advance before you officially approved this particular amendment on October 4th that as soon as it was approved the state would impose this ten percent disallowance; isn't that so?

A I don't know if we knew for a fact but it was a reasonable assumption to make that they would impose the ten percent.

THE COURT: When you say you didn't know for a fact, you mean Governor Carey didn't tell you but that was the assumption?

THE WITNESS: Yes.

Q You operated on that assumption, is that correct?

THE COURT: Or you made your decision knowing that that was likely to occur.

THE WITNESS: That is correct, we made it knowing it was likely to occur." (Tr. 530–31)

and earlier:

"Q Did HEW approve any methods or standards pursuant to which a determination would be made as to the number of hours an intern or resident might be engaged in education activities not directly related to patient care?

A No, I don't believe so." (Tr. 527–28)

He agreed that the only evidence HEW relied upon in granting the approval it did was a summary of the National Institute of Medicine Study, the very study which, as indicated above, the HEW Washington office determined "inadequate" in its communication of August 20, 1976. (PX–12) He admitted that the document did not relate

to New York hospitals, an admission accentuated by the statement of Dr. Robert Whelan, Commissioner of Health, that the State Department of Health had never conducted a study of interns and residents time (Tr. 1794) and that "it has not been determined yet either nationally or statewide as to whether this is an educational experience or not." (Tr. 1795)

We find the approval of the amendment to Section 86.26, under the circumstances described, to have been arbitrary and capricious, indeed to have constituted a total abdication of responsibility on the part of HEW with regard to the subject.

This view is fortified by the fact that under the regulations, the hospitals have no right to appeal the 10% disallowance of resident-intern salaries. HEW itself has, properly in our opinion, argued that the appeal provisions legitimatize the other amendments by providing a method of individual treatment for what might otherwise be arbitrary disallowance. HEW's approval of a scheme which it knew would produce a non-appealable 10% disallowance, although it had earlier disapproved a specific request to authorize a 10% disallowance, was arbitrary and capricious.

If HEW agreed with the State that some portion of resident-intern salary was allocable to education, and non-reimbursable, it was obligated to require the State to determine, on a rational basis, what the extent of that portion was. If it did not agree with the State, there was no basis for the approval.

*Miscellaneous Objections*

*Failure to Consult The Medical Advisory Committee*

■ The hospitals argue that the State's failure to consult the Medical Advisory Committee (MAC) (see § 365–c, New York State Social Services Law (McKinney's 1976)) before submission of the 1976 plan to HEW was a deficiency which required HEW's disapproval of the plan as a matter of law. They base this claim on 45 C.F.R. § 246.10(a)(3), which, in pertinent part, provides that the:

". . . Medical Care Advisory Committee will have adequate opportunity for meaningful participation in policy development and program administration, including the furtherance of recipient participation in the program of the [State] agency [responsible for promulgating the Medicaid plan]."

There is no question, and we find, that the State failed to consult MAC before presenting the 1976 plan to HEW (Tr. 819, 2073; see also, *id.* at 1384–88). However, it does not follow that the State's failure to comply with the applicable State statute and federal regulation warrants reversal of HEW's approval of the 1976 plan. The duty to consult MAC is one that runs directly against the State, see *Benton v. Rhodes*, 586 F.2d 1 (6th Cir. 1978); *Becker v. Toia*, 439 F.Supp. 324 (S.D.N.Y.1977); *Robinson v. Maher*, C.C.H. Medicaid and Medicare Guide, ¶ 27,707 (D.Conn.1976), and to overturn HEW's decision on account of the State's dereliction of this duty would have the effect of imposing on HEW—in its review and approval role—all the substantive obligations that are, by statute and regulation, properly the State's. Such an imposition would improperly amend HEW's status from editor to author of the plan. See *Hospital Association of New York State, Inc. v. Toia, supra,* 438 F.Supp. at 869. Moreover, such a requirement is not suggested by the regulations themselves, 45 C.F.R. § 250.30, as one which HEW ought to have taken into consideration in approving the State plan. In sum, though the State's failure to work with MAC is deplorable, if not explicitly illegal, the appropriate remedy is the commencement of a compliance proceeding, not the undoing of HEW's approval.

*The "Ever-Declining Ceiling"*

■ The hospitals argue that if the 100% average were imposed as a ceiling year after year, the effect would be continuously to reduce the amount of the hospitals' reimbursement, since, as hospitals kept cutting costs to meet the ceiling, the group

average would keep going down. The hospitals contend that HEW should have considered this "ratchet effect" and that its failure to do so was a clear error of judgment. We disagree.

First, there was no convincing evidence that the ratchet effect would necessarily occur. Indeed, there was evidence that averages might stabilize as below-group-average cost hospitals were paid a rate above their costs. (Tr. 3348–49) More important, however, the question whether the 1976 plan would create a ratchet effect in later years was not a proper consideration for HEW at the time it approved the plan, for there was no way of telling whether the State would or would not continue to use the 100% ceiling in the years to come. In short, even if the hospitals had established that the 100% average would—if continued—create a ratchet effect, the issue was not ripe for HEW consideration. (See Tr. 929)

We have considered plaintiffs' other arguments and believe them to be without merit.

\* \* \* \* \* \*

Although this lengthy and complex litigation arose from amendments to the New York State Medicaid Plan, the issue to be decided has never been whether the amended plan was meritorious but whether in approving the amendments, as required by law, HEW acted arbitrarily or capriciously or whether its decision constituted a clear error of judgment. We find that in approving the amendment which set reimbursement ceilings at 100% of hospital group averages for routine and ancillary costs of hospitals, HEW did not act arbitrarily or capriciously; that in approving the amendment reducing reimbursement of interns' and residents' salaries from 100% to 90% HEW did act arbitrarily and capriciously; and that the State's failure to consult the Medical Advisory Committee did not require HEW's disapproval of the amended plan as a matter of law.

This memorandum constitutes our findings of fact and conclusions of law.

Submit judgment on notice.